# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

TIMOTHY L. COLEMAN,

                                      :

           Petitioner,                           Case No. 3:03-cv-299

                                        :            District Judge Edmund A. Sargus, Jr.
       -vs-                                           Magistrate Judge Michael R. Merz

MARGARET BRADSHAW, Warden,

                                       :

           Respondent.

---

# REPORT AND RECOMMENDATIONS

---

This is a capital habeas corpus case brought pursuant to 28 U.S.C. § 2254. Petitioner seeks relief from his convictions for aggravated murder with capital and firearm specifications and having weapons while under disability. (Petition, Doc. No. 9, ¶ 4[1], PageID 1)[2].

## Factual Background

On direct appeal, the Ohio Supreme Court reported the factual background of this case as follows:

---

[1] The Petition also lists convictions for aggravated trafficking in drugs and possession of criminal tools, but those are from the Drug case and he does not seek relief from that conviction in this case.
[2] The PageID number is applied automatically by the Court's electronic filing system and numbers in order each page of the docket. Although there were eight filings prior to the Petition, it is the first document filed after the CM/ECF system was adopted and hence its first page is PageID 1.

On the night of January 2, 1996, Melinda Stevens was shot to death in an alley behind Riddle's Ribs in Springfield, Ohio. Timothy Coleman, appellant, was convicted of her aggravated murder and sentenced to death.

During the previous summer, Stevens had worked as a confidential informant for the Springfield police and made controlled purchases of drugs from suspected drug dealers. On three separate occasions, Stevens made purchases of crack cocaine from Coleman, which were observed and recorded by the police.

As a result of these sales, a grand jury indicted Coleman in September 1995 for aggravated trafficking in cocaine and associated possession offenses. Stevens was a material witness to these offenses, but her identity was not listed in the indictment. Colement pled not guilty to these charges.

While in jail awaiting trial for these charges, Coleman told his cellmate, James R. White, that he had discovered that Stevens was the one that "got him busted" and that "if he [Coleman] got out on bond, he was going to take care of her." According to White, Coleman stated that he had a newborn baby, was facing fifteen to forty-five years on the pending drug charges, and "couldn't * * * do that much time in the joint." Coleman had known White for years and asked him to "take care" of Stevens if White got bailed out first. However, Coleman was released first on October 12. Another inmate, Donovan Hayes, testified that he heard Coleman tell White "That if it was her [Stevens] that was responsible for him being here, he would have to do something to her."

White was released from jail in mid-November and testified that Coleman again asked him to help "take care" of Stevens. They talked about burning down Stevens's house or the possibility of White shooting her. Early on January 2, 1996, Coleman saw White twice and told White he would pick him up that evening to take care of Stevens, but Coleman never showed up. On January 3, after Stevens had been killed, Coleman told White that "he took care of his business."

Christopher Holtz testified that he saw Stevens and Coleman on the evening of January 2, 1996 around 7:00 or 8:00 p.m. at Riddle's Ribs, apparently buying takeout food. Holtz recalled that Coleman was wearing a flannel-type shirt and that Stevens and Coleman left Riddle's together around the same time Holtz did. Holtz last saw the two alone in a nearby alley. The weather that

evening was cold, windy, and snowing. As Holtz was walking home, he heard shots.

Around 7:25 p.m., police and paramedics responded to the alley behind West Pleasant Street near Riddle's Ribs, the scene of a shots-fired report. They found Stevens lying face up with no pulse or respiration and only minimal heart activity. Although the paramedics took Stevens to the hospital, the coroner later concluded that Stevens had died at 7:20 p.m. on January 2, 1996. Icy rain had fallen that evening, followed by heavy snow and strong winds, thereby hampering investigative efforts.

Coleman frequently visited the house of Fayette Strodes in Springfield. Strodes's granddaughter, Dana, had a child by Coleman, and Fayette's son, James Strodes, was Coleman's friend. Prior to January 2, 1996, Coleman told Fayette several times that "he was going to kill [a] black bitch" to whom he had sold drugs because she was a "drug informant." Vera L. Strodes, Fayette's daughter, also recalled Coleman discussing his legal problems, saying, "he was going to kill her."

Hope Strodes, Fayette's granddaughter, recalled that Coleman visited the Strodeses' house early on the evening of January 2, and asked her for some bullets. Hope told him that there was a box of bullets on a shelf. Coleman took some bullets, showed Hope a silver gun with a clip, and said, "I'm going to go take care of a bitch that set me up."

Around 7:30 p.m. that same evening, Coleman stopped in for a few minutes to see Gaskins and told her, "I took care of my business." When asked what he meant, Coleman replied, "Bloop, bloop, two to the back of the head * * *. The bitch fell like a rock," while demonstrating at the same time what happened by physically falling to the floor. After January 3, Coleman again talked with Gaskins and disclosed to her that the murder occurred in an alley behind Riddle's Ribs and that he had slowed down while walking in order to shoot Stevens from behind.

After Coleman left Gaskins's house that night, he went back to the Strodeses' residence. Hope, Vera, and Fayette all testified that Coleman did not look normal and was nervous. Vera testified that he was wearing a flannel shirt that had cockleburs on it. Coleman told Fayette that he "had took care of it." When she asked what, he said "Melinda" and "twice in the head" because he "couldn't do that many years."

3

On January 3, 1996, police interviewed Coleman after advising him of his rights. Coleman asserted to police that sometime after 7:00 p.m. on January 2, Stevens came to the house of Coleman's daughter, next to Riddle's Ribs, and asked him for money to buy food for her children. Coleman told her he was not going to give her money, but that he would walk over there and pay it for her. After going to Riddle's and paying for the food, Coleman stated that he left, did not see Stevens again, and did not know she had been murdered.

Coleman later talked with Vera Strodes about the fact that people on the street were saying that he shot Stevens. At first, Coleman denied shooting Stevens, but later admitted to Vera that he "did take the bitch out." While in jail awaiting trial, Coleman described the murder to fellow inmate Antwan Warren, revealing that while he was walking out of the restaurant with Stevens, he "slowed down his step and shot her."

Dr. Robert Stewart, a forensic pathologist, concluded that Stevens died as a result of two gunshot wounds, one to the back of her head and one to the base of her neck. The first bullet stopped at the front-left side of her brain. The second bullet shattered the first vertebra and severed her spinal cord, traveled upward into the sinus cavity, and lodged just under the cheek skin.

Because the weather stayed cold until mid-January, ice and snow remained on the ground, hampering efforts to secure physical evidence at the murder scene. One officer estimated that on January 3, there were two inches of ice and four inches of closely packed snow in the alley. Eventually, on January 17, police officers found two spent .380 caliber shell casings near a bloodstain remaining in the alley.

A forensic expert identified the two bullets removed from Stevens's body as either .380 caliber bullets fired from an automatic or semiautomatic firearm, particularly either a Colt government model or a Davis P-380. The Davis P-380 comes either in steel or chrome models. Gunpowder residue on Stevens's clothing indicated that she had been shot from less than four feet away.

In May 1996, Coleman shared a prison cell with Steven L. Kasler, an inmate at an Ohio correctional center. Coleman told Kasler that he was awaiting trial for killing a drug informant named Melinda Stevens, and that he thought "if he killed her * * * he could beat his drug charges." Coleman said he shot Stevens twice in the back

of the head using a Davis P-380.  He also told Kasler that he shot her in an alley under "pretty severe, blizzard conditions" because he thought the weather would hamper the investigation.  He then disclosed to Kasler that he had gotten rid of his gun and hidden his clothes in a doghouse in Fayette's back yard.  In fact, police never found the murder weapon, but did recover from the Strodeses' doghouse a tennis shoe and a flannel shirt identified as clothing that Coleman wore on January 2.

Coleman was indicted in March 1996 for the aggravated murder of Melinda Stevens with prior calculation and design.  Count I of the indictment contained a death specification that Coleman murdered Stevens, a witness to an offense, to prevent her from testifying in a criminal proceeding in violation of R.C. 2929.04(A)(8).  Count I of the indictment also contained a firearm specification in violation of R.C. 2929.71.  Furthermore, the grand jury indicted Coleman for possession of a firearm while under a disability.

The trial jury found Coleman guilty on all charges.  Following the penalty phase hearing, the jury recommended the death penalty, and the trial court sentenced Coleman to death.

*State v. Coleman*, 85 Ohio St.3d 129, 129-132 (1999).

## History of the Case

On September 11, 1995, Petitioner Timothy Coleman was indicted by the Clark County Grand Jury for aggravated trafficking in narcotics and possessing criminal tools (Case No. 95-CR-0484; the "Drug Case").   On January 2, 1996, Melinda Stevens, the confidential drug informant in that case, was shot to death in an alley in Springfield, Ohio.

On March 18, 1996, the Clark County Grand Jury indicted Petitioner under Ohio Revised Code § 2903.01(A) for the aggravated murder of Stevens with a capital specification under Ohio Revised Code § 2929.04(A)(8) that the victim was a witness to an offense who was purposely killed to prevent her testimony in a criminal proceeding and the aggravated murder was not

committed during the commission, attempted commission, or flight immediately after the commission or attempted commission of the offense to which the victim was a witness and with a firearm specification under Ohio Revised Code § 2929.71.  Coleman was charged in Count Two with having a weapon while under a disability in violation of Ohio Revised Code § 2923.13.  (Case No. 96-CR-0142; the "Murder Case.")

The Drug Case was tried to a jury in April, 1996.  Coleman was found guilty of all charges and took no appeal from the conviction (Petition, Doc. No. 9, ¶ 8(e)(2).)  In February, 1997, a jury convicted Coleman of all charges in the Murder Case and he was sentenced to death. Because the murder had occurred after January 1, 1995, Coleman's direct appeal was to the Ohio Supreme Court. He pled the following propositions of law:

> **Proposition of Law I**
>
> When defense uses trial strategies that are harmful to their client and fails to object to obvious constitutional errors during trial, a capital defendant is deprived of the right to the effective assistance of counsel that is guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, §§ 9, 10 and 16 of the Ohio Constitution.
>
> **Proposition of Law II**
>
> When the State fails to introduce sufficient evidence of aggravated murder, a resulting conviction deprives a capital defendant of substantive and procedural due process as guaranteed by the Eighth, Ninth and Fourteenth Amendments to the United States Constitution, as well as Article I, sections 1, 16 and 20 of the Ohio Constitution.
>
> **Proposition of Law III**
>
> A capital defendant is denied his rights to a fair trial, due process of law and a reliable determination of his guilt and sentence as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution when irrelevant and cumulative testimony and other physical exhibits from a prior trial

are admitted into evidence when their prejudicial effect outweighs their probative value.

**Proposition of Law IV**

The defendant is entitled to a new trial when the State uses its peremptory challenge in a racially discriminatory manner in violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution and Article I, § 2 of the Ohio Constitution.

**Proposition of Law V**

A conviction based on the admission of tape recordings which are so inaudible as to create a danger of unfair prejudice substantially outweighing any probative value violates the Fifth, Eighth and Fourteenth Amendments to the U.S. Constitution as well as Article I, §§ 2, 10 and 16 of the Ohio Constitution.

**Proposition of Law VI**

When a capital defendant is detained in a county other that [sic] that in which he is charged for a capital crime, he is denied the rights to confer with counsel, assist in the preparation of his defense, and the assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 2, 9, 10, and 16 of the Ohio Constitution.

**Proposition of Law VII**

Ohio's capital sentencing scheme is unconstitutional as applied because it results in sentences which are inconsistent, inappropriate and disproportionate to the penalty imposed in similar cases in violation of the Eighth and Fourteenth Amendments to the United States Constitution, and Ohio Revised Code § 2929.05 (A).

**Proposition of Law VIII**

Ohio Rev. Code Ann. § 2929.04(A)(8) is unconstitutionally vague therefore, a death sentence predicated on the (A)(8) aggravating circumstance violates the Eighth and Fourteenth Amendments to the United States Constitution and Article I, § 9 of the Ohio Constitution.

**Proposition of Law IX**

Sentencing an individual to death in violation of treaties to which the United States of America is a signatory violates the Supremacy Clause of the United States Constitution.

**Proposition of Law X**

The death penalty authorized by the Ohio Revised Code deprives capitally charged defendants of their lives without due process of law, denies equal protection and imposes cruel and unusual punishment in violation of the Ohio and United States Constitutions.

(Return of Writ, Doc. No. 167, Apx. Vol. 4 at 30.) The Ohio Supreme Court affirmed the conviction and sentence. *State v. Coleman*, 85 Ohio St. 3d 129 (1999).

On November 3, 1997, Coleman filed a Petition for Post-Conviction Relief under Ohio Revised Code § 2953.21 pleading the following claims for relief:

**First Ground for Relief**

The judgment and sentence against Timothy Coleman are void or voidable because the recent amendments to the Ohio post-conviction process violate his constitutional rights to due process which the Ohio and United States Constitutions afford him.

The amendments by the Ohio Legislature to Rule 35 of Criminal Procedure, which became effective on July 1, 1997, curtail the post-conviction process, rendering it practically devoid of any meaning. (Exhibit 27). Rule 35(A) now demands that each ground for relief contained in a post-conviction petition not exceed three pages. The Staff Notes to the amendment state that the purpose of this change is to "introduce some uniformity in post-conviction relief proceedings and aid in the administration of justice." (Exhibit 27).

**Second Ground for Relief**

The judgment and sentence against Timothy Coleman are void or voidable because the trial court erred in overruling defense counsel's motion to view grand jury proceedings. This error

deprived Mr. Coleman of possible exculpatory information, thus violating his right to a fair trial.

**Third Ground for Relief**

The judgment and sentence against Timothy Coleman are void or voidable because he did not receive the effective assistance of counsel during the trial phase of his capital trial. Counsel fell far below a minimum standard or reasonable legal representation in that they failed to conduct a reasonable investigation and failed to show a particularized need for grand jury transcripts which could have revealed prosecutorial misconduct.

**Fourth Ground for Relief**

Timothy Coleman was denied his right to a fair trial due to his counsel's failure to conduct adequate voir dire. Because of defense counsel's ineffectiveness, a juror, who had disclosed in his questionnaire that he was "related to or a close friend of" the "county prosecutor or his staff" was allowed to sit on the jury which eventually found Mr. Coleman guilty of all charges and sentenced him to death.

**Fifth Ground for Relief**

The judgment and sentence against Timothy L. Coleman are void or voidable because he did not receive the effective assistance of counsel during all phases of his capital trial. Counsel fell far below a minimum standard of reasonable legal representation when they failed to meet with previous trial counsel who had conducted an investigation of Mr. Coleman's murder charges. Counsel also failed to conduct follow-up investigation of witnesses and information contained within the previous counsel's investigation. As a result of this failure, Mr. Coleman was prejudiced in the first phase of his trial.

**Sixth Ground for Relief**

The judgment and sentence against Timothy Coleman are void or voidable because he did not receive the effective assistance of counsel during the guilt phase of his trial. Counsel fell far below a

minimum standard of legal representation by not presenting alibi testimony which was available for discovery during trial.

**Seventh Ground for Relief**

The judgment and sentence against Timothy L. Coleman are void or voidable because he did not receive the effective assistance of counsel during the first phase of his trial.  Counsel fell far below a minimum standard of legal representation when they failed to introduce testimonial evidence of improper police influence in the arrest of Timothy Coleman for the murder of Melinda Stevens.

**Eighth Ground for Relief**

The judgment and sentence against Timothy L. Coleman are void or voidable because he did not receive the effective assistance of counsel during his trial.  Counsel fell far below a minimum standard of reasonable legal representation when counsel admitted that they did not give careful attention to Mr. Coleman's case so they could "hurry up" to work on another case.

**Ninth Ground for Relief**

The judgment and sentence against Timothy Coleman are void or voidable because he did not receive the effective assistance of counsel during the sentencing phase of his trial.  Counsel fell far below a minimum standard of legal representation in conducting the first phase of the trial, by not introducing residual doubt arguments to the jury.

**Tenth Ground for Relief**

The judgment and sentence against Timothy Coleman are void or voidable because he did not receive the effective assistance of counsel during the sentencing phase of his trial.  Defense counsel's failure to conduct an adequate investigation into Mr. Coleman's background for mitigating evidence, resulted in a violation of his constitutional rights as guaranteed by the United States Constitution and the Ohio Constitution.

**Eleventh Ground for Relief**

The judgment and sentence against Timothy Coleman are void or voidable because of the ineffective assistance of his court-appointed counsel during the sentencing phase of his trial. Counsel fell far below a minimum standard of reasonable legal representation by numerous actions and failures to act, thus violating the guaranteed [sic] by the United States Constitution and the Ohio Constitution.

**Twelfth Ground for Relief**

The judgment and sentence against Timothy Coleman are void or voidable because he did not receive the effective assistance of counsel during the mitigation phase of his capital trial. Counsel fell far below a minimum standard of reasonable legal representation in their failure to present the testimony of an expert psychologist. Because of counsel's error, no psychological evidence was presented by the defense at the mitigation phase.

**Thirteenth Ground for Relief**

The judgment and sentence against Timothy Coleman are void or voidable because he did not receive the effective assistance of counsel during the sentencing phase of his trial. Counsel fell far below a minimum standard of reasonable legal representation in their failure to present the testimony of an expert psychologist. Because of counsel's error, no psychological evidence was presented by the defense at the mitigation phase. The mitigation phase was likely to be the stage of the proceedings where Tim's counsel could have done the most good. *Glenn v. Tate*, 71 F.3d 1204, 1206 (1995), citing *Kubat v. Thieret*, 867 F.2d 351, 369 (7th Cir.), *cert. denied*, 493 U.S. 874 (1989). Trial counsel committed a crucial error during the mitigation phase: they failed to conduct an adequate investigation into Tim's background. Had they done so, they could have presented mitigating testimony from Steven Williams, a Deputy Sheriff at the Clark County Jail.

**Fourteenth Ground for Relief**

The judgment and sentence against Timothy Coleman are void and or voidable because his defense counsel failed to retain the services of a cultural expert. As a result, Mr. Coleman was denied the

11

effective assistance of counsel guaranteed to him by the Sixth Amendment to the United States Constitution, and similar provisions of the Ohio Constitution.

**Fifteenth Ground for Relief**

The judgment and sentence against Timothy Coleman are void or voidable because he did not receive the effective assistance of counsel during the sentencing phase of his capital trial. Defense counsel delivered a closing argument that not only omitted all the mitigating evidence that was presented, but also turned possible mitigating factors into aggravating circumstances. As a result, Mr. Coleman was denied the effective assistance of counsel that is guaranteed to him by the Sixth Amendment to the United States Constitution, and similar provisions in the Ohio Constitution.

**Sixteenth Ground for Relief**

The judgment and sentence against Timothy Coleman are void or voidable because he did not receive the effective assistance of counsel during all phases of his capital trial. Counsel fell far below a minimum standard of reasonable legal representation. The cumulative impact of the litany of errors that occurred during Timothy Coleman's trial, rendered his capital proceedings unconstitutional.

**Seventeenth Ground for Relief**

The judgment and sentence against Timothy Coleman are void or voidable because he did not receive the effective assistance of counsel during all phases of his capital trial. Counsel fell far below a minimum standard of reasonable legal representation with the failure to impeach witness Christopher Holtz's testimony with a prior statement made to the police. (Exh. 45).

**Eighteenth Ground for Relief**

The judgment and sentence against Timothy Coleman are void or voidable because he did not receive the effective assistance of counsel during all phases of his capital trial. Counsel fell far below a minimum standard of reasonable legal representation with the failure to impeach witness Lynnda Gaskins' testimony with a prior statement she made to the police on 4/5/96. (Exh. 46).

**Nineteenth Ground for Relief**

The judgment and sentence against Timothy Coleman are void or voidable because he did not receive the effective assistance of counsel during all phases of his capital trial. Counsel fell far below a minimum standard of legal representation with the failure to impeach witness Steve Kasler's testimony with a prior statement he made to the police on 6/20/96. (Exh 47).

**Twentieth Ground for Relief**

The judgment and sentence against Timothy Coleman are void or voidable because he did not receive the effective assistance of counsel during all phases of his capital trial. Counsel fell far below a minimum standard of legal representation with the failure to impeach James White's testimony with a prior statement offered at Timothy Coleman's aggravated drug trafficking trial (Case No. 95-CR-0484). (Exh. 48).

**Twenty-First Ground for Relief**

The judgment and sentence against Timothy Coleman are void or voidable because he did not receive the effective assistance of counsel during all phases of his capital trial. Counsel fell below a minimum standard of reasonable legal representation with the failure to investigate other plausible leads as to the identity of the killer.

**Twenty-Second Ground for Relief**

The judgment and sentence of Petitioner are void or voidable because the death penalty as administered by electrocution in the State of Ohio violates his constitutional rights to protection from cruel and unusual punishment and to due process of law. U.S. Const. Amends. VIII, IX, XIV; Ohio Const. Art. I §§ 9, 10, 16; *Ohio Adult Parole Authority v. Woodward*, ____ U.S. ____ , 118 S. Ct. 1244 (1998)(five justices holding that the Due Process Clause protects the "life" interest at issue in capital cases).

**Twenty-Third Ground for Relief**

The judgment and sentence against Petitioner are void or voidable because the death penalty as administered by lethal injection in the State of Ohio violates his constitutional rights to protection from cruel and unusual punishment and to due process of law. U.S. Const. amends. VIII, XI, XIV; Ohio Const. art. I §§ 9, 10, 16; Ohio Adult Parole Authority v. Woodward, ____ U.S. ____ , 118 S. Ct. 1244 (1998)(five justices holding that the Due Process Clause protects the "life" interest at issue in capital cases).

("First Amended Post-Conviction Petition," Return of Writ, Doc. No. 167, Apx. Vol. 10 at 1.)

The trial court denied relief on June 1, 2001 (Return of Writ, Doc. No. 167, Apx. Vol. 10 at 160-175).  Coleman appealed to the Ohio Second District Court of Appeals on June 27, 2001, raising only one assignment of error:

Assignment of Error No. I: The trial court erred in dismissing appellant's post-conviction petition where he presented sufficient operative facts to merit an evidentiary hearing and discovery.

Issues Presented for Review and Argument:
1) Is dismissal appropriate where Appellant's post-conviction petition raises substantive grounds for relief, relies upon evidence outside the record containing sufficient operative facts, and raises constitutional violations?

2) When a post-conviction petition sets forth meritorious claims, is dismissal appropriate without first granting an evidentiary hearing and discovery?

(Return of Writ, Doc. No. 167, Apx. Vol, 11, at 71).

About a month later on July 21, 2001, Attorney Staughton Lynd, identifying himself as an attorney involved with a number of death row inmates, wrote to Coleman as follows:

Yesterday I was told something that is potentially of great importance to you.  I was told, by a person in a position to know, that another prisoner on death row wishes to confess publicly to the murder for which you have been convicted.

14

(Return of Writ, Doc. No. 167, Apx. Vol. 14 at 56.)  Coleman was at the time represented by Ohio Public Defender David Bodiker;  J. Joseph Bodine, his assistant, was one of the counsel of record.  On August 3, 2001, Bodine obtained an affidavit from death row inmate William Sapp admitting to the murder of Melinda Stevens.  The Sapp Affidavit provided details as to a beer bottle at the scene, the clothing worn by Stevens, the type of weapon used, and the location of her wounds. *Id*. at 26-27.  In addition to the affidavit, counsel was also able to discover Sapp's involvement in the Springfield drug culture, his history of violence against women, and a letter he wrote to one of his victims in which he attempted to scare and threaten her by claiming responsibility for a murder "off of Pleasant [Street]." *Id*. at 28.

As a result of this newly discovered evidence, Coleman filed several motions in the Common Pleas Court, including a motion for relief from judgment pursuant to Ohio R. Civ. P. 60(b), a motion for discovery, a second post-conviction petition[3], and a motion for new trial which stated he "did not kill Melinda Stevens. He has obtained evidence that identifies William Sapp as the actual killer. Further, Coleman has evidence that this exculpatory evidence was known, but not disclosed, by the Clark County Prosecutor."(Return of Writ, Doc. No. 167, Apx. Vol. 14 at 19.)  In addition, he requested that all the State's physical evidence, specifically a Colt 45 beer bottle and the rape evidence collection kit that had been performed on the victim, be made available for inspection and forensic testing, for discovery, and for preservation. *Id*. at 58.

Based on these motions. Coleman requested the court of appeals to stay its proceedings. (Return of Writ, Doc. No. 167, Apx. Vol. 12 at 136.)   The stay was granted March 25, 2002. (Decision and Entry, Return of Writ, Doc. No. 167, Vol. 12 at 143.)

---

[3] His second post-conviction relief petition pled two grounds for relief:  actual innocence and a *Brady v. Maryland* violation (Return of Writ, Doc. No. 167, Apx. Vol. 14 at 96-99).  These form the basis of his First and Second Grounds for Relief in his habeas corpus petition.

Sapp had claimed he had sex with Melinda Stevens before shooting her and that he had drunk a Colt 45 beer just before the shooting and left the bottle at the scene. Police had a rape test kit collected from Ms. Stevens body and a Colt 45 bottle. Common Pleas Judge Lorig ordered them tested by the Ohio Bureau of Criminal Investigation (Entry, Return of Writ, Doc. No. 167, Vol. 14 at 167). At about the same time, in light of the possible protracted new trial and successive post-conviction proceedings in the Common Pleas Court, the court of appeals lifted the stay of its proceedings (Decision and Entry, Return of Writ, Doc. No. 167, Vol. 12 at 158) and then affirmed denial of the first post-conviction petition. *State v. Coleman*, No. 2001-CA-42, 2002-Ohio-5377, 2002 Ohio App. LEXIS 5396 (Ohio App. 2nd Dist. Oct. 4, 2002). On March 12, 2003, the Ohio Supreme Court declined jurisdiction over a further appeal. *State v. Coleman*, 98 Ohio St. 3d 1478 (2003).

On July 22, 2004, Judge Lorig denied the motion for new trial and the second post-conviction petition, as well as parallel motions filed in the Drug Case (Decision and Judgment Entry, Return of Writ, Doc. No. 167, Vol. 15 (Amended) at 170-180). The Second District Court of Appeals affirmed. *State v. Coleman,* 2005-Ohio-3874, 2005 Ohio App. LEXIS 3583 (Ohio App. 2nd Dist. July 29, 2005), and the Ohio Supreme Court again declined to accept an appeal. *State v. Coleman*, 107 Ohio St. 3d 167 (2005).

On June 27, 2003, before completion of the state court proceedings, Coleman filed his habeas corpus petition in this Court, pleading eight grounds for relief:

### First Ground for Relief

Petitioner is actually innocent of Melinda Stevens's murder. His convictions and death sentence violate the U.S. Constitution. U.S. Const. Amends. VI, VIII, XIV.

**Second Ground for Relief**

The State of Ohio withheld material exculpatory evidence pointing to a perpetrator other than Petitioner in violation of Petitioner's due process rights. U.S. Const. Amends. V, XIV.

**Third Ground for Relief**

Petitioner was denied his right to the effective assistance of counsel at the trial phase of his capital case as guaranteed by the U.S. Const. Amends. VI and XIV.

**Fourth Ground for Relief**

Petitioner's Constitutional right to a fair, non-arbitrary and reliable capital sentencing hearing was violated by his counsel's ineffective assistance at the mitigation phase of his capital trial. U.S. Const. Amends. V, VI, VIII, XIV.

**Fifth Ground for Relief**

The State of Ohio's exclusion of a petit juror from Petitioner's capital trial on the basis of the juror's race rendered a constitutionally infirm conviction and sentence. United States Constitution, Eighth and Fourteenth Amendments.

**Sixth Ground for Relief**

Petitioner's conviction was based on the admission of tape recordings, which are so inaudible as to create a danger of unfair prejudice substantially outweighing any probative value, thereby violating Petitioner's due process rights. U.S. Const. Amends. VI, VIII, XIV.

**Seventh Ground for Relief**

When the prejudicial effect of introducing irrelevant and cumulative testimony and physical exhibits from a prior trial outweighs any probative value, Petitioner's [sic] is denied due process and a reliable determination of his guilt and sentence. U.S. Const. Amends. V, VI, VIII, XIV.

**Eighth Ground for Relief**

Petitioner's convictions and sentences are constitutionally infirm because the evidence was insufficient to prove Petitioner killed the decedent with prior calculation and design. United States Constitution, Fifth, Sixth, Eighth and Fourteenth Amendments.

(Petition, Doc. No. 9.)

On June 28, 2004, Respondent moved to dismiss the First Ground as not cognizable in habeas corpus and unexhausted, the Second Ground as unexhausted, the Third Ground sub-claims related to a fingerprint expert and failure to present testimony from Charles Foster as procedurally defaulted for lack of presentation in the state courts, and the Sixth Ground as procedurally defaulted for lack of a contemporaneous objection (Motion to Dismiss, Doc. No. 18, PageID 169). Judge Sargus denied the Motion without prejudice as to Grounds One and Two, denied the Motion as to Ground Three, and granted the Motion as to Ground Six (Opinion and Order, Doc. No. 32). The reference of the case was transferred to the undersigned October 14, 2009 (Doc. No. 152). The Return of Writ was filed February 23, 2010 (Doc. No. 167) and the Reply on August 24, 2010 (Doc. No. 170). On July 1, 2011, the Court noted that the case was ripe for decision (Doc. No. 197).

# ANALYSIS

## First Ground for Relief:  Actual Innocence

In his First Ground for Relief, Coleman asserts he is actually innocent of the murder of Melinda Stevens  (Petition, Doc. No. 9, PageID 8).

The Warden's first response was that this claim was unexhausted (Motion to Dismiss, Doc. No. 18).  Judge Sargus declined to find constructive exhaustion (Opinion and Order, Doc. No. 32, PageID 451-458), the state court proceedings were completed, and the Warden has withdrawn the motion to dismiss on that basis (Doc. No. 43).

The First Ground for Relief is what has come to be known as a "free standing" claim of actual innocence:  a petitioner asserts that the Constitution directly forbids his execution because he is actually innocent.  Such a claim is contrasted with a "procedural" or "gateway" actual innocence claim, that is, a claim that a petitioner's actual innocence excuses his procedural default in presenting some other constitutional claim in state court.  The procedural actual innocence doctrine was recognized by the Supreme Court in *Schlup v. Delo*, 513 U.S. 298 (1995), and is summarized by the Sixth Circuit in *Souter v. Jones,* 395 F.3d 577 (6th Cir. 2005), as follows:

> [I]f a habeas petitioner "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims."

*Id.* at 590, *quoting Schlup* at 513 U.S. at 316.

It is at this point unclear whether a free-standing actual innocence claim is cognizable in habeas corpus.  *In re Davis*, 565 F.3d 810 (11th Cir. 2009).  The leading Supreme Court case, relied on by Petitioner, is *Herrera v. Collins*, 506 U.S. 390 (1993).  There Chief Justice Rehnquist, writing for the Court, noted that actual innocence claims based on newly discovered evidence, "have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."  *Id.* at 400.  The *Herrera* Court left the possibility of a free-standing actual innocence claim open by noting "for the sake of argument in deciding [the] case, that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would  render the  execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim."  *Id.* at 417;  *see also House v. Bell*, 547 U.S. 518 (2006); *In re Davis*, *supra*. Thus, the *Herrera* Court left open the possibility of such a claim of actual innocence; however, it did not go on to decide the claim, stating that  it was "neither necessary nor advisable" to resolve the issue of freestanding actual innocence claim in this case, where the petitioner was  "not innocent." *Herrera*, 506 U.S. at 419-421.  The only guidance provided as to the standard for such a claim was that the threshold to show actual innocence "would necessarily be extraordinarily high" and that the evidence presented by Herrera fell short of that standard. *Id*. at 418-419.

The Supreme Court again declined to resolve the question in *House v. Bell*, when it determined that Petitioner failed to satisfy the high burden that a hypothetical actual innocence claim would require. 547 U.S. 518 (2006).  The *House* Court did however note the sequence of the decisions in *Herrera* and *Schlup*, and stated that "first leaving unresolved the status of freestanding claims and then establishing the gateway standard implies at the least that *Herrera* requires  more  convincing  proof  of  innocence  than  *Schlup*." *Id.*  at  555.  The  Court  then

determined that given the closeness of House's actual innocence claim under *Schlup*, it necessarily follows that he failed to meet the higher burden of actual innocence implied under the *Herrera* decision. *Id*. This Report uses the standards implied by *Herrera, House,* and *Schlup* to decide Coleman's First Ground for Relief.

When a state court decides on the merits a federal constitutional claim later presented to a federal habeas court, the federal court must defer to the state court decision unless that decision is contrary to or an objectively unreasonable application of clearly established precedent of the United States Supreme Court. 28 U.S.C. § 2254(d)(1); *Harrington v. Richter*, 562 U.S. ___, 131 S. Ct. 770, 785 (2011); *Brown v. Payton,* 544 U.S. 133, 140 (2005); *Bell v. Cone*, 535 U.S. 685, 693-94 (2002); *Williams (Terry) v. Taylor,* 529 U.S. 362, 379 (2000).

The last state court to give a reasoned decision on this claim was the Second District Court of Appeals on appeal from denial of the second post-conviction petition. That court also assumed that a free-standing claim of actual innocence was cognizable and decided the merits of that claim as presented by Coleman.

> Defendant's primary claim for relief is that he is actually innocent of the murder of Melinda Stevens. Defendant claims that William Sapp, who was convicted and sentenced to death for an unrelated double murder of two girls in Springfield, is the actual killer of Stevens. Defendant's primary support for this claim is an affidavit executed by Sapp on August 3, 2001, wherein Sapp admits killing Melinda Stevens behind Riddle's Ribs near Pleasant Street, in Springfield. Sapp describes what Stevens was wearing, the type of gun he used, the approximate time of the shooting, and the type of beer he had finished drinking just before shooting Stevens. Sapp further avers that when he was arrested and interviewed by Springfield police about the other murders of two girls in Springfield, which occurred in April 1997, he told police at that time that he had killed Melinda Stevens.
>
> As additional support for his claim of actual innocence, Defendant submitted a copy of a letter Sapp wrote to Una Timmons sometime after Sapp was convicted and sentenced in an unrelated case in

1996 for Kidnapping, Attempted Rape and Felonious Assault offenses in which Timmons was the victim. The letter was in the possession of the State. The date the letter was written is unknown, but a newspaper article was published on July 14, 1998 about the letter. In the letter Sapp threatens to harm Timmons because she testified against him at trial. In an effort to convince Timmons that he was serious about his threats, Sapp reminded Timmons of some of his other crimes including "killing your friend over off of Pleasant." Defendant Coleman claims that the reference is reasonably construed to refer to Melinda Stevens, and that the assertion corroborates Sapp's later claim in his affidavit that he killed Stevens.

In response to Defendant's claim of actual innocence, the State filed transcripts of a recorded interview between Springfield police and William Sapp which took place on June 18, 2002, after the underlying actions were filed. During that interview, Sapp completely recanted the statements in his previous affidavit and he denied that he killed Melinda Stevens or ever told police that he had done so. According to Sapp, Defendant Coleman's attorney wrote out the affidavit and he simply signed it. Sapp also indicated in that interview that his reference in the Timmons letter to someone he killed "over off of Pleasant" was meant to indicate Gloria White, not Melinda Stevens.

* * *

We now turn to the merits of Defendant's claim of actual innocence. A persuasive demonstration of actual innocence made after trial would render the execution of a defendant unconstitutional. *Herrera v. Collins* (1993), 506 U.S. 390, 418, 122 L.Ed. 2d 203, 113 S. Ct. 853. Defendant's claim of actual innocence in this case is founded on the statements in Sapp's affidavit, which the trial court found lacks any credibility.

In reviewing petitions for post-conviction relief, a trial court may, in the exercise of its sound discretion, weigh the credibility of affidavits submitted in support of the petition in determining whether to accept the affidavits as true statements of fact. *State v. Calhoun*, 86 Ohio St. 3d 279, 1999 Ohio 102, 714 N.E.2d 905. That same doctrine also comfortably applies to affidavits submitted in support of a motion for a new trial based upon newly discovered evidence that is material to the defense. In assessing the credibility of affidavits, the trial court should consider all relevant factors, including:

22

(1) whether the judge reviewing the post-conviction relief petition also presided at the trial, (2) whether multiple affidavits contain nearly identical language, or otherwise appear to have been drafted by the same person, (3) whether the affidavits contain or rely on hearsay, (4) whether the affiants are relatives of the petitioner, or otherwise interested in the success of the petitioner's efforts, and (5) whether the affidavits contradict evidence proffered by the defense at trial. Moreover, a trial court may find sworn testimony in an affidavit to be contradicted by evidence in the record by the same witness, or to be internally inconsistent, thereby weakening the credibility of that testimony.

*Calhoun, supra*, at 285.

One or more of the *Calhoun* factors, to the extent that any of them apply, may be sufficient to justify a conclusion that an affidavit asserting information outside the record lacks credibility. *Id*.

The trial court's decision dismissing Defendant's successive post-conviction petition without a hearing was, in effect, a grant of summary judgment to the State contemplated by R.C. 2953.21(D). Although, ordinarily, in summary judgment proceedings the trial court cannot weigh and consider the credibility of evidentiary material such as affidavits, pursuant to *Calhoun* the trial court is permitted in post-conviction proceedings to weigh the credibility of affidavits submitted in support of a post-conviction petition, to a limited extent.

The trial court held that Defendant's claim of actual innocence is wholly without merit because it is founded upon Sapp's affidavit, which lacks any credibility. We find that in so holding the trial court did not abuse its discretion, as that term is defined by law, in rejecting Sapp's affidavit for lack of credibility. See, *State v. Adams* (1980), 62 Ohio St. 2d 151, 404 N.E. 2d 144. The court noted that Sapp is a convicted double murderer who is under a sentence of death and has nothing to lose by claiming responsibility for another murder. The timing of Sapp's affidavit also renders its validity suspicious, because it was prepared and notarized by Defendant's own attorney just two months after the trial court had denied Defendant's first post-conviction petition. The psychological report on Sapp prepared by Dr. Schmidtgoessling for use in his double murder case mentions Sapp's "chronic lying."

23

The *Calhoun* factors pertain to weaknesses or inconsistencies on the face of affidavits or the way in which they were procured, and permit the court to refer to the prior trial record to compare the averments in affidavits against the evidence that was offered. It is another matter to reject affidavits on the basis of information obtained after a petition or motion is filed. Therefore, we believe that Sapp's affidavit may not be rejected because he recanted its allegations in a subsequent interview with police officers on June 18, 2001. Such conflicts merit a hearing if a choice between competing versions is made. Nevertheless, the court had other, sound grounds to reject Sapp's affidavit.

Sapp's affidavit is inconsistent with the facts of Melinda Stevens' murder and contradicted by the overwhelming evidence of Defendant's guilt presented at trial. Sapp's claim that he was with Melinda Stevens minutes before he killed her is contradicted not only by Defendant himself, who admitted to police that he was with Stevens at Riddles Ribs moments before she was shot, but also by the testimony of Christopher Holtz, who saw Defendant and Stevens leave Riddles Ribs together and walk into the alley behind Riddles Ribs. Moments later, Holtz heard gunshots. Furthermore, no less than seven witnesses testified at Defendant's trial, his friends and jail buddies, about how Defendant bragged that he was going to kill Stevens for her role in his being arrested and charged with drug offenses, and then, after the fact, about how he had killed Stevens. Finally, in affirming Defendant's conviction and death sentence, the Ohio Supreme Court observed that nothing in the record suggests any killer other than Coleman, and such a claim is baseless. *Coleman, supra*, 85 Ohio St. 3d at 134.

Importantly, the same judge that rejected Defendant's successive post-conviction claim of actual innocence also presided over Defendant's trial and was therefore very familiar with the evidence against him. *Calhoun, supra*. Based upon hearing all of the evidence at trial, and in accordance with *Calhoun*, the trial court could reasonably reject Sapp's affidavit for lack of credibility, as it did, because while the evidence at trial shows that Defendant had ample motive and opportunity to kill Stevens, Sapp's affidavit fails to believably portray either. In other words, when viewed in the context of the overwhelming evidence of Defendant's guilt, Sapp's declaration that he is responsible for killing Stevens is so improbable as to constitute no credible evidence.

Defendant has failed to submit evidentiary documents containing sufficient operative facts to demonstrate substantive grounds for

> relief on his claim of actual innocence, regardless of whether the
> claim is presented as a successive post-conviction petition, motion
> for a new trial, or motion for relief from judgment.  The trial court
> did not abuse its discretion when it dismissed Defendant's
> successive post-conviction petition, motion for a new trial and
> motion for relief from judgment asserting an actual innocence
> claim without a hearing.

*State v. Coleman*, 2005 Ohio App LEXIS 3583, ¶¶ 18-33 (2nd Dist. 2005).

Assuming that the Supreme Court would recognize[4] a free-standing actual innocence claim, Coleman has not shown that the court of appeals' decision is contrary to or an objectively unreasonable application of the standards for proving such a claim announced in *Herrera*, *Schlup*, and *House*.

In support of his claim, Coleman presents the following as new evidence of his innocence: that another death row inmate, William Sapp, confessed to killing Stevens, and described the crime in detail, both identifying the murder weapon and the location of the crime scene, as well as giving a description of the victim and the gunshot wounds. (Petition, Doc. No. 9, PageID 8); (Traverse, Doc. No. 170, PageID 1899); (Return of Writ, Doc. No. 167, Apx. Vol. 14 at 26-27.)   He further argues that additional evidence lends itself to Sapp's being the probable killer; specifically that Sapp was  known to have victimized several women in Ohio, killing at least three and injuring others, and that Sapp was an active and violent predator in the Springfield area at the time of Stevens' death. (Traverse, Doc. No. 170, PageID 1899); (Return of Writ, Doc. No. 167, Apx. Vol. 14 at 31-33, 39, 41.)  Further, Petitioner asserts that the State's theory for motive was that Stevens' death was prompted by her involvement as an undercover drug informant.  Sapp was also involved in the drug trade as both a user and dealer. *Id*.

The information contained within the Sapp affidavit describes what Stevens was wearing on the night of the murder, the type of gun used, the approximate time of the shooting, and the

---

[4] This analysis put to one side the question whether such recognition would be retroactive.

brand of beer Sapp had finished drinking just prior to shooting Stevens. Sapp further stated that when he was arrested and interviewed by Springfield police in relation to the murders of two Springfield girls, which occurred in April 1997, he told police that he had killed Melinda Stevens. (Return of Writ, Doc. No. 167, Apx. Vol. 14 at 26-27.) Coleman argues that Sapp's involvement as the killer is further supported by a letter that Sapp wrote to one of his surviving victims, Una Timmons. In this letter he threatens the victim and reminds her that he is dangerous and is responsible for a murder "off of Pleasant Street." *Id*. at 28-30. Stevens' murder occurred in the same general geographical location, in an alley behind Riddle's Ribs off of Pleasant Street.

As the court of appeals noted, in an interview with police on April 3, 2002, Sapp completely repudiated his affidavit, denying that he killed Melinda Stevens or that he had ever told police he had done so. (Return of Writ, Doc. No. 167, Apx. Vol. 15 at 64, 71-79.) According to Sapp, Coleman's attorney wrote out the affidavit and he simply signed it. *Id*. at 77-79. Sapp also indicated in that interview that the woman referred to in the Una Timmons letter that he killed "over off of Pleasant," was Gloria White, not Melinda Stevens. *Id*. at 83. Although the court of appeals could not consider Sapp's recantation on appeal from a grant of summary judgment to the State (See *State v. Coleman*, 2005-Ohio-3874, 2005 Ohio app. LEXIS 3583, ¶ 30 (Ohio App. 2nd Dist. July 29, 2009)), this Court is not under that constraint in assessing Sapp's credibility and his recantation makes his initial affidavit all that much less credible.

Additionally, the evidence presented at trial was very damaging to Petitioner. Christopher Holtz testified that he saw Coleman leave Riddle's Ribs with Stevens and go into the alley. (Trial Tr. Vol. 5 at 848.) Moments later he heard gunshots come from the direction of the alley. *Id*. at 849, 853. James White testified that not only was he aware of the murder plans prior

to the act, but that Coleman had enlisted him to help with the murder and that they had discussed it on several occasions. (Trial Tr. Vol. 5 at 720-749.)  Some of the conversations concerned the method of murder, the possibilities of which included setting Stevens' home on fire, or hiding in the bushes to shoot her. *Id*. at 724.  White saw Coleman on the day of the murder at which time he was informed that Coleman planned to "take care of it that night." *Id*. at 728.  Another inmate, Donovan Hayes, testified that he overheard some of these conversations between Coleman and White while they were all incarcerated. *Id*. at 741.  Further, Fayette Strodes[5] testified that prior to the murder, Coleman told her that he could not serve time for the drug trafficking charge so he planned on killing the informant, Stevens. (Trial Tr. Vol. 5 at 918-941.)  Lynda Gaskins also testified that Coleman was upset when he discovered that Stevens had been an informant and had threatened to harm or kill her. (Trial Tr. Vol. 6 at 1123, 1125.)  Hope Strodes testified that the night of the murder Coleman came to her home, showed her a silver gun with a clip, asked for bullets, and stated that he was going to take care of the "bitch that set me up." (Trial Tr. Vol. 6 at 949-951.)  Hope Strodes stated that Coleman returned later that night looking for a police scanner. *Id*. at 952.  Fayette Strodes stated that Coleman had admitted to her that he had shot Stevens twice in the head, that he had "taken care of it." (Trial Tr. Vol. 5 at 918-941.)  Vera Strodes testified that Coleman came to the house that night, that he was jittery and nervous and looking for a police scanner. (Trial Tr. Vol. 6 at 1013.)  She had previously heard him reference the drug charges, saying it was nothing and he was not going to do the time. *Id*. at 1017.  Antwan Warren, who was in jail with Petitioner, stated that Coleman described the murder to him, both in terms of how it happened and the weapon used. *Id*. at 1095-1096.

---

[5] Fayette Strodes was deceased by the time the Murder Case was tried.  Her testimony from the Drug Case was offered in lieu of live testimony.

Likewise, inmate Steve Kasler, testified that Coleman had told him about the drug trafficking charges, about Stevens' being an informant, and about killing her to prevent her testimony. *Id*. at 1103-1107. Kasler presented specific details including how Coleman and Stevens met that night, the location and number of wounds, the type of gun used in the murder, the weather conditions on the night of the murder, the fact that Coleman had gotten rid of the gun, and possible plans to kill others, including Fayette and Vera Strodes, as they were willing to testify against him in the murder trial. *Id*. Kasler further stated that not only did Coleman tell him how he shot Stevens, but he demonstrated how and where he shot her. *Id*. at 1110. Lynda Gaskins also testified that Coleman told her of his plans prior to the murder and also that he came to her house that night, described the details of the actual murder, and demonstrated how Stevens fell once she had been shot. *Id*. at 1129-1130, 1133-1136.

Given all of this testimony and his own recantation, Sapp's claim that he murdered Melinda Stevens is completely incredible. Coleman's First Ground for Relief is therefore without merit and the Second District Court of Appeals decision to that effect is not an objectively unreasonable application of *Herrera*, *House*, and *Schlup*. The First Ground for Relief should therefore be dismissed with prejudice.

Under Rule 11 of the Rules Governing § 2254 Cases, a court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." To obtain a certificate of appealability, a petitioner must show at least that "jurists of reason would find it debatable whether the petition states a valid claim of denial of a constitutional right." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). That is, it must find that reasonable jurists would find the district court's assessment of the petitioner's constitutional claims debatable or wrong or because they warrant encouragement to proceed further. *Banks v. Dretke*, 540 U.S. 668, 705 (2004);

*Miller-El v. Cockrell,* 537 U.S. 322, 336 (2003).  If the district court dismisses the petition on procedural grounds without reaching the constitutional questions, the petitioner must also show that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.  *Slack*, 529 U.S. at 484.  The procedural issue should be decided first so as to avoid unnecessary constitutional rulings. *Slack*, 529 U.S. at 485, *citing Ashwander v. TVA*, 297 U.S. 288, 347 (1936)(Brandeis, J., concurring).  The first part of this test is equivalent to making a substantial showing of the denial of a constitutional right, including showing that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further, *Slack v. McDaniel*, 529 U.S. 473 at 484 (2000), *quoting Barefoot v. Estelle,* 463 U.S. 880, 893 (1983). The relevant holding in *Slack* is as follows:

> [W]hen the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue (and an appeal of the district court's order  may be taken) if the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

529 U.S. at 478.

The standard is higher than the absence of frivolity required to permit an appeal to proceed *in forma pauperis.  Id.* at 893.

> Obviously the petitioner need not show that he should prevail on the merits... Rather, he must demonstrate that the issues are debatable among jurists of reason;  that a court could resolve the issues [in a different manner];  or that the questions are 'adequate to deserve encouragement to proceed further.'

*Id.* n.4.  *Accord, Miller-El v. Cockrell*, 537 U.S. 322 (2003).  A certificate of appealability is not to be issued *pro forma* or as a matter of course.  *Id*. at 1040.  Rather, the district and appellate courts must differentiate between those appeals deserving attention and those which plainly do not. *Id*.  A blanket certificate of appealability for all claims is improper, even in a capital case. *Frazier v. Huffman*, 348 F.3d 174 (6th Cir. 2003), *citing Porterfield v. Bell,* 258 F.3d 484 (6th Cir. 2001).

Reasonable jurists would not disagree with the Magistrate Judge's proposed disposition of the First Ground for Relief and therefore Coleman should not be granted a certificate of appealability on this ground.

### Second Ground for Relief:  Violation of *Brady v. Maryland*

In his Second Ground for Relief, Coleman argues the State withheld exculpatory evidence in violation of its duty under *Brady v. Maryland*, 373 U.S. 83 (1963).  As with the First Ground, the Warden originally claimed this Ground for Relief was unexhausted, but has withdrawn that claim in light of the final state court decision in the second post-conviction relief proceeding.

To understand the basis for Coleman's *Brady* claims, a short chronology is helpful. Melinda Stevens was found murdered on January 2, 1996.  Coleman stood trial for the murder and was sentenced on February 21, 1997.  Shortly thereafter, William Sapp was questioned by the police on April 2 and 3, 1997, on the unrelated murders of two young Springfield girls.  In his later obtained affidavit, Sapp claimed during that interview he informed the officers that he was responsible for the murder of  Stevens. (Return of Writ, Doc. No. 167, Apx. Vol. 14 at 26.)

30

In July of 1998, Sapp sent a letter to one of his victims, Uma Timmons, claiming responsibility for the murder of a woman in the Springfield area, though he did not describe or name the victim. *Id*. at 28.  It was not until July 21, 2001, when contacted by an attorney alerting him to Sapp's claims, that Coleman had any indication someone else was claiming responsibility for the murder.  On August 3, 2001, Petitioner's attorney obtained a sworn affidavit from Sapp confessing to the murder. *Id*. at 26.

Petitioner then filed motions for; leave to file a motion for a new trial, motions for relief from judgment, and a successive petition for post-conviction relief.  Judge Lorig, a trial court judge in the Clark County Court of Common Pleas, reviewed the actual innocence claim, which was based primarily on the new evidence of Sapp's affidavit, newspaper articles recounting Sapp's violent past, Sapp's psychological profile, and the letter from Attorney Lynd alerting Coleman to Sapp's confession. (" Decision and Judgment Entry," Return of Writ, Doc. No. 167, Apx. Vol. 15 (Amended) at 170-171.)  Judge Lorig further noted Coleman's *Brady* claims in support of his actual innocence, specifically, the allegation contained in Sapp's affidavit that he had confessed to Stevens' murder to the police and the police/prosecutor withheld this confession, and that a second confession was made in a letter purportedly written by Sapp to one of his victims, Uma Timmons. *Id*. at 172-175.

Judge Lorig held that this evidence was insufficient for the relief Coleman was seeking.  Specifically he held that Coleman failed to offer any other evidentiary submission to support the alleged confession contained in the affidavit.  He further held:

> Coleman's claim of actual innocence is wholly without merit.  It is founded on the affidavit of a confessed double murderer under a sentence of death, who thus has little to lose in claiming another murder.  Moreover, the psychological report on Sapp by Dr. Schmidtgoessling provides a myriad of reasons why Sapp's word, sworn or otherwise, lacks reliability.  The timing of the affidavit

31

> also causes skepticism of its contents, where it was written and
> notarized by Coleman's own attorney just two months after this
> Court denied Coleman's fist post-conviction petition.  In addition,
> Sapp disavowed the affidavit during his interview with detective
> Moody.

*Id*. at 177.  The court also found that Detective Moody, through an affidavit, denied that Sapp

had confessed to killing Stevens. This is supported through a transcript of Moody's interview

with Sapp, in which Sapp denied killing Stevens or confessing to the murder and stated that the

affidavit was written by Coleman's counsel. *Id*. at 175.  The trial judge also held that in regard to

the Timmons' letter that there was no reason to believe that the letter was exculpatory as the only

link between the confession in this letter and the murder of Stevens is Coleman's allegation.

Coleman failed to provide any evidence to support this link. *Id*. at 174. Without more, the threat

of carrying out violence against Timmons like he did to "your friend off of Pleasant" was not

enough to show that he was referring to Melinda Stevens. *Id*. at 175.

The Judge also memorialized the agreement between the parties for scientific testing on a

beer bottle found at the crime scene, as well as on the rape kit performed on the victim. *Id*. at

176.  At the time of the original testing "the results showed no genetic material on the beer

bottle, and insufficient genetic material from the rape kit for DNA identification.  Consequently,

the outcome of this testing lent no support to Coleman's claim of innocence." *Id*.  Given the

strength of evidence against Coleman, and based on all the evidence, Judge Lorig overruled the

motions and dismissed the successive petition for post-conviction. *Id*. at 180.

Coleman then appealed to the Second District Court of Appeals, the last state court to

give a reasoned decision on this ground, which held:

> We now turn to the merits of Defendant's claim that the State
> committed a violation of the requirements of *Brady v. Maryland*

32

(1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194, when it failed to disclose to Defendant's counsel exculpatory evidence that Sapp, and not Coleman, killed Melinda Stevens. That claim is supported by Sapp's affidavit, wherein Sapp claims that when Springfield police interviewed him in connection with the murder of two Springfield girls, which occurred on April 2 and 3, 1997, he told police at that time that he had killed Melinda Stevens. As further support for this claim, Defendant also relies on the letter Sapp wrote to Una Timmons, which was in the possession of the State and never turned over to defense counsel, wherein Sapp refers to killing someone "over off Pleasant." Defendant claims that this is a reference to Melinda Stevens, and it corroborates Sapp's claim in his affidavit that he killed Melinda Stevens.

As we previously discussed, the trial court properly rejected Sapp's affidavit because it lacks any credibility. As for the Timmon's letter, it makes no specific reference to the murder of Melinda Stevens. It refers only to the killing of someone "over off Pleasant."

In order to constitute a violation of due process, the evidence withheld from Defendant must be (1) favorable to the defendant and (2) material to guilt or innocence. *Brady*, supra. Defendant's bare allegation that Sapp's reference in the Timmons letter to someone "over off Pleasant" means Melinda Stevens is not evidence that supports that proposition. While the letter is certainly favorable to Defendant to the extent that it suggests Sapp was the perpetrator, given the vague, indefinite reference in the Timmons letter to someone Sapp had killed "over off Pleasant," the jury would necessarily have had to speculate as to whether Sapp was referring to Melinda Stevens. Therefore, the letter is simply too indefinite in its nature to be material to Defendant's guilt or innocence with respect to the killing of Melinda Stevens. No *Brady* violation is demonstrated.

*State v. Coleman*, 2005 Ohio App. LEXIS 3583, *18-19 (2nd Dist. 2005).

The State has a duty to produce exculpatory evidence in a criminal case. If it withholds material evidence, the conviction must be reversed. *Brady v. Maryland*, 373 U.S. 83 (1963). The materiality of the favorable evidence "must be evaluated in the context of the entire record." *United States v. Agurs*, 427 U.S. 97, 112-113 (1976). "Evidence is material only if there is a

reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 683 (1985).

There are three essential components of a true *Brady* violation: the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; the evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued. *Strickler v. Greene*, 527 U.S. 263 (1999):

> In *Brady*, this Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S., at 87, 83 S.Ct. 1194.  We have since held that the duty to disclose such evidence is applicable even though there has been no request by the accused, *United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and that the duty encompasses impeachment evidence as well as exculpatory evidence, *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Such evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id*., at 682, 105 S.Ct. 3375; see also *Kyles v. Whitley*, 514 U.S. 419, 433-434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).  Moreover, the rule encompasses evidence "known only to police investigators and not to the prosecutor." *Id*., at 438, 115 S.Ct. 1555.  In order to comply with *Brady*, therefore, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." *Kyles*, 514 U.S., at 437, 115 S.Ct. 1555.

*Id*. at 280.

The Sixth Circuit has explained habeas corpus review of a state court decision on a *Brady* claim as follows:

> Under *Brady v. Maryland*, 373 U.S. 83 (1963), the prosecution must disclose all material, exculpatory evidence to a defendant, irrespective of whether the failure to disclose was done in good or bad faith.  To assert a successful *Brady* claim, a habeas petitioner

34

> must show that (1) the withheld evidence was favorable to the petitioner, (2) the evidence was suppressed by the government, and (3) the petitioner suffered prejudice. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). The *Brady* rule encompasses both exculpatory and impeachment evidence when such evidence is material. *United States v. Bagley*, 473 U.S. 667, 676 (1985). This Court explained in *United States v. Bencs* that "[m]ateriality pertains to the issue of guilt or innocence, and not to the defendant's ability to prepare for trial." 28 F.3d 555, 560 (6th Cir. 1994) (citing *United States v. Agurs*, 427 U.S. 97, 112 n.20 (1976)). Evidence is material under *Brady* if a reasonable probability exists that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Bagley*, 473 U.S. at 682. A reasonable probability is one that sufficiently undermines confidence in the outcome of the trial. *Id.* "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). When determining whether the withheld information was material and therefore prejudicial, we consider it in light of the evidence available for trial that supports the petitioner's conviction. See *Towns v. Smith*, 395 F.3d 251, 260 (6th Cir. 2005); *Clinkscale v. Carter*, 375 F.3d 430, 445 (6th Cir. 2004).

*Jells v. Mitchell*, 538 F.3d 478, 501-02 (6th Cir. 2008).

Petitioner alleges that the State violated *Brady* when it failed to provide Coleman with the information identifying Sapp as the perpetrator of this crime. (Petition, Doc. No. 9, PageID 10.) Specifically, Petitioner cites to a letter written by Sapp to one of his victims, Una Timmons, as well as his confession to law enforcement. *Id.*

To meet *Brady* criteria the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; the evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued. *Strickler v. Greene*, 527 U.S. 263 (1999). Certainly, if true, the various confessions by Sapp in the form of the letter and the confession (supported by an affidavit) would be favorable to Coleman.

35

However, to succeed in this claim, he must show prejudice ensued from this suppressed evidence.

For reasons set forth in the analysis of Ground One, the Sapp affidavit is not credible evidence. The letter written by Sapp to his victim, Timmons, does in fact reference a murder off of Pleasant. Coleman argues that, "[w]hile [Detective] Moody believes White is the person whom Sapp is referring to in his letter to Timmons, the fact that Sapp has never been charged with White's murder leaves open the very real possibility that Sapp's reference was to Stevens' murder." (Traverse, Doc. No. 170, PageID 1911-1912.) The letter, however, fails to offer specifics, so the idea that it references Stevens is merely speculative. Furthermore, the Court notes that the letter suffers from the same credibility issues as the affidavit. Just because the letter was purportedly been written by Sapp, it does not necessarily follow that the information contained therein is the absolute truth, especially given his noted propensity for "chronic lying." The Court also observes that during the police interview in which he recants the affidavit, the detective noted that in the past Sapp had claimed responsibility for crimes he did not commit.

Petitioner supports this *Brady* claim with the DNA testing performed on a beer bottle found in the alley behind Riddle's Ribs. (Traverse, Doc. No. 170, PageID 1912.) He argues that there is genetic evidence on the bottle that Stevens shared a beer with an unidentified person in the alley prior to her murder. *Id*. He further asserts that this supports Sapp's statement in the affidavit that he shared a beer with Stevens. *Id*. Petitioner sought and was granted DNA testing by the state court. Forensic testing was done on both the beer bottle and the rape kit performed on Stevens. The report from BCI stated that the DNA profile from the rape kit slides was consistent with the victim, Melinda Stevens. No DNA was detected on the beer bottle. (Doc.

No. 121,   Ex. 14, PageID 1070.) Bode Technology Group also tested the evidence and discovered only a partial female profile. *Id*. at 1071.

Coleman motioned this Court for additional testing or retesting of the above items, in addition to Stevens' underwear and shorts which had never been tested. (Motion for Funds for Expert Assistance, Doc. No. 45.)  He based this request on the newly discovered confession of Sapp, in which he stated he had shared a beer with Stevens and had engaged in intercourse with her prior to killing her. *Id*. at PageID 557.  The requested retesting could be used to determine whether Coleman or Sapp was the source of the biological evidence. In addition Coleman cited to allegations of error-ridden testing practices by Bode Technology Group. *Id*.  The motion was granted and DNA testing was performed again. Upon completion, Coleman filed a motion to expand or supplement the record. (Doc. No. 121.)   After further forensic analysis, it was determined that both Coleman and Sapp were eliminated as contributors to the DNA found in the rape collection kit and that there was not enough genetic information found on the beer bottle to make a determination.[1] (Doc. No. 121, Ex. 15-16.)  The results do not support Coleman's contention that Sapp was the actual perpetrator. Regardless of the results, this Court notes that we cannot consider this evidence under *Cullen v. Pinholster* as those results were  not before the state courts. *Cullen v. Pinholster*, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011).  The *Pinholster* Court ruled that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Id*. at 1398.  It supported this holding by stating that "[i]t would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that was unreasonably applied federal law to facts not before the state court." *Id*. at 1399.  The court continued to clarify that evidence introduced in federal court has

---

[1]All but one of the alleles found on the small sample collected from the beer bottle were compatible with Stevens.

no bearing in 2254(d)(1) review.  If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254 (d)(1) on the record that was before the state court.

In viewing the above evidence in context of the entire record, there is not a reasonable probability that the result of the proceeding would have been different, even given the Sapp affidavit.  The affidavit lacked credibility and as outlined in the First Ground for Relief, the evidence against Petitioner was overwhelming. Admission of the information contained in the affidavit would not have undermined the confidence in the outcome.  The decision of the state court was neither contrary to, nor an unreasonable application of Supreme Court law.

In this case, the Magistrate Judge concludes reasonable jurists could disagree with his conclusion that the Second Claim for Relief should be dismissed with prejudice.  If the District Court does dismiss the Claim as recommended, the Magistrate Judge also recommends that a certificate of appealability be issued on this claim.

## Third Ground for Relief:  Ineffective Assistance at Trial

In his Third Ground for Relief, Coleman asserts he was denied the effective assistance of counsel at trial during the guilt phase  (Petition, Doc. No. 9, PageID 12); (Traverse, Doc. No. 170, PageID 1922).

Respondent asserts this claim should be summarily denied for failure to plead the claim appropriately (Return of Writ, Doc. No. 167, PageID 1847).  As with Ground One, the Court

concludes that the pleading of this claim satisfies Rule 2(c) of the Rules Governing § 2254 Cases.

Petitioner presented an ineffective assistance of trial counsel claim on direct appeal. *State v. Coleman*, 85 Ohio St. 3d 129, 133-135 (1999). He raised this claim again, with supporting evidentiary documentation, in his first post-conviction relief petition. The trial court denied relief and upon review, the court of appeals affirmed, *State v. Coleman*, 2002 Ohio 5377, 2002 Ohio App. LEXIS 5396 (2nd Dist. Ohio 2002), and the Ohio Supreme Court declined further review. *State v. Coleman*, 98 Ohio St. 3d 1478, 2003 Ohio 974, 784 N.E.2d 711 (2003).

The governing standard for ineffective assistance of counsel is found in *Strickland v. Washington*, 466 U.S. 668 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687. In other words, to establish ineffective assistance, a defendant must show both deficient performance and prejudice. *Berghuis v. Thompkins,* ___ U.S. ___, ___, 130 S.Ct. 2250, 2255 (2010), *citing Knowles v. Mirzayance,* 556 U.S. 111 (2009).

With respect to the first prong of the *Strickland* test, the Supreme Court has commanded:

> Judicial scrutiny of counsel's performance must be highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged

> conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

466 U.S. at 689.

As to the second prong, the Supreme Court held:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to overcome confidence in the outcome.

466 U.S. at 694. *See also Darden v. Wainwright*, 477 U.S. 168, 184 (1986), *citing*, *Strickland, supra.*; *Wong v. Money,* 142 F.3d 313, 319 (6th Cir. 1998), *citing*, *Strickland, supra*; *Blackburn v. Foltz*, 828 F.2d 1177, 1180 (6th Cir. 1987) *quoting Strickland,* 466 U.S. at 687. "The likelihood of a different result must be substantial, not just conceivable." *Storey v. Vasbinder*, 657 F.3d 372, 379 (6th Cir. 2011), *cert. denied,* ___ U.S. ___, 132 S.Ct. 1760 (2012), *quoting Harrington v. Richter*, 562 U.S. ___, ___, 131 S. Ct. 770, 792 (2011).

As to the prejudice prong, the test is whether counsel's errors have likely undermined the reliability of, or confidence in, the result. *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996), citing *Lockhart v. Fretwell*, 506 U.S. 364 (1993). "Counsel is constitutionally ineffective only if [his or her] performance below professional standards caused the defendant to lose what he otherwise probably would have won." *United States v. Morrow,* 977 F.2d 222 (6th Cir. 1992). Defects in assistance that have no probable effect on the trial's outcome do not establish a constitutional violation. *Mickens v. Taylor,* 535 U.S. 162, 166 (2002). To show prejudice the new evidence that a habeas petitioner presents must differ in a substantial way – in strength and subject matter – from the evidence actually presented. *Hill v. Mitchell*, 400 F.3d 308 (6th Cir. 2005).

As with other constitutional claims, where the state courts have decided a claim of ineffective assistance of trial counsel on the merits, that decision is entitled to deference unless the petitioner can show that it was contrary to or an objectively unreasonable application of Supreme Court precedent.

Petitioner makes the general assertion of ineffectiveness of counsel based on their failure to investigate. (Traverse, Doc. No. 170, PageID 1924.) He argues that counsel failed to do the very basics, such as having read the discovery provided by the State. *Id.* He also specifically states that no DNA evidence linked him to the murder, yet defense counsel did nothing to challenge the evidence offered by the State, such as the pair of shoes and flannel shirt. (Petition, Doc. No. 9, PageID 12); (Traverse, Doc. No. 170, PageID 1924.) Counsel failed to question the size, the condition, and the existence of fingerprints or DNA on these items. *Id.* He presented this sub-claim of insufficiency of the evidence/lack of physical evidence in both direct appeal and in post-conviction relief. On direct appeal, the state supreme court applied the *Strickland* standard in its analysis and held:

> In his first proposition of law, appellant contends that his trial counsel rendered ineffective assistance. Reversal of convictions on ineffective assistance requires that the defendant show, first, "that counsel's performance was deficient" and, second, "that the deficient performance prejudiced the defense * * * [so as] to deprive the defendant of a fair trial." *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674, 693. Accord *State v. Bradley* (1989), 42 Ohio St. 3d 136, 538 N.E.2d 373, paragraph two of the syllabus.
>
> A.     Failure to Challenge Insufficiency of Evidence
>
> Coleman contends that his counsel failed to "adequately illustrate the insufficiency of the State's case" against him. He asserts that no physical evidence linked him to the crime scene, that testimony against him was inconsistent, and that a substantial number of leads pointed to a killer other than Coleman. Yet, despite Coleman's claims, his counsel's tactical choices did not fall below

41

"an objective standard of reasonable representation." *Bradley*, 42 Ohio St. 3d 136, 538 N.E. 2d 373, paragraph two of the syllabus.

Coleman cites materials and documents that he claims his counsel did not fully exploit, and that reflect witness bias, grounds for impeachment, and asserted inconsistencies between trial testimony and pretrial statements or former testimony. However, Coleman largely cites and relies upon materials released by the state in open pretrial discovery, as well as transcripts from other cases. Yet these materials were not in evidence before the trial court and are not in the record before this court. Because "[a] reviewing court cannot add matter to the record before it, which was not a part of the trial court's proceedings," Coleman's attempt to have this court consider this material must fail. *State v. Ishmail* (1978), 54 Ohio St. 2d 402, 8 Ohio Op. 3d 405, 377 N.E.2d 500, paragraph one of the syllabus. Any allegations of ineffectiveness based on facts not appearing in the record should be reviewed through the postconviction remedies of R.C. 2953.21. *State v. Cooperrider* (1983), 4 Ohio St. 3d 226, 228, 4 Ohio B. Rep. 580, 582, 448 N.E.2d 452, 454.

Next, Coleman contends that no physical evidence linked him to the crime scene. However, Coleman admitted to police the day after the murder that he was with Stevens at Riddle's Ribs, near the murder scene, and that he left with her near the time of the murder. Additionally, Christopher Holtz, an unimpeached eyewitness, saw both Stevens and Coleman at Riddle's and in the alley outside, shortly before Holtz heard shots and the murder occurred.

Nor was it even necessary for the physical evidence to prove Coleman's identity as the killer. Over the course of several months, Coleman repeatedly told eyewitnesses that he intended to kill Stevens and why he intended to do so. On the day of the murder, he told Hope Strodes that he intended to shoot "the bitch" that day; also that day, he told James White that he was "going to take care of it [the murder]." Immediately after the murder, Coleman separately told Fayette Strodes and Lynnda Gaskins what he had done, demonstrating to Gaskins how "the bitch fell like a rock." Later, he also admitted to White, Vera Strodes, and Gaskins that he had shot Stevens. Months later, Coleman admitted to inmate Kasler how and why he had shot Stevens and furnished details the killer would have known.

In any event, there was physical evidence and other testimony that reinforced Coleman's admissions that he had killed Stevens. Inmate Donovan Hayes corroborated White's testimony. Fayette,

Gaskins, and White all testified to Coleman's obsession to get Stevens. Several witnesses testified that Coleman wore a flannel shirt that evening, with cockleburs stuck on it. Police later found a flannel shirt replete with cockleburs, identified as what Coleman wore that day, abandoned in a doghouse at the Strodeses' residence.

Dr. Stewart, the pathologist, confirmed descriptions given by Coleman to Gaskins and Kasler as to where and how Coleman shot Stevens, i.e., two bullets to the back of the head. Also, the severed vertebrae corroborated Coleman's description that Stevens "dropped like a rock" when she was shot. Furthermore, shells of .380 caliber bullets were found at the scene, and a forensic expert verified that the .380 caliber bullets were likely fired from a Davis P-380, the same type of gun that Coleman told Kasler he used to shoot Stevens. Additionally, Davis P-380 automatics come in chrome models and Hope Strodes saw Coleman with a silver, semi-automatic gun less than an hour before the murder. Given the strength of this evidence, Coleman's claim that a substantial number of leads point to another killer other than Coleman is baseless. Nothing in the record suggests any other killer.

Coleman's counsel presented credible and competent representation by attempting to challenge his identity as the killer, an enormous task given Coleman's propensity to talk about how he was going to kill Stevens and, after the deed, how he had done so. Counsel examined witnesses about their asserted bias or impeached their character, where appropriate. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Strickland*, 466 U.S. at 689. 104 S. Ct. at 2065, 80 L.Ed. 2d at 694. Here, no deficient performance of duty occurred.

Additionally, Coleman fails to establish that any prejudice arose from his counsel's tactical decisions. To show prejudice, "the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley*, 42 Ohio St. 3d 136, 538 N.E. 2d 373, paragraph three of the syllabus. In view of the compelling evidence of Coleman's guilt, different tactical choices would have made no difference.


*State v. Coleman*, 85 Ohio St. 3d 129, 133-135 (1999).

Coleman supplied additional evidence outside the record and presented this claim again on post-conviction relief.  The court of appeals again determined the claim lacked merit based upon the following reasoning:

> Coleman contends counsels' failure to pursue the investigation was particularly egregious given the lack of physical evidence tying him to Stevens' homicide.  The Ohio Supreme Court, however, addressed this claim that there was a lack of physical evidence linking Coleman to the crime.
>
> In any event, there was physical evidence and other testimony that reinforced Coleman's admissions that he had killed Stevens.  Inmate Donovan Hayes corroborated White's testimony.  Fayette, Gaskins, and White all testified to Coleman's obsession to get Stevens.  Several witnesses testified that Coleman wore a flannel shirt that evening, with cockleburs stuck on it.  Police later found a flannel shirt replete with cockleburs, identified as what Coleman wore that day, abandoned in a doghouse at the Strodeses' residence.
>
> Dr. Stewart, the pathologist, confirmed descriptions given by Coleman to Gaskins and Kasler as to where and how Coleman shot Stevens, i.e., two bullets to the back of the head.  Also, the severed vertebrae corroborated Coleman's description that Stevens "dropped like a rock" when she was shot.  Furthermore, shells of .380 caliber bullets were likely fired from a Davis P-380, the same type of gun that Coleman told Kasler he used to shoot Stevens.  Additionally, Davis P-380 automatics come in chrome models and Hope Strodes saw Coleman with a silver, semi-automatic gun less than an hour before the murder.  Given the strength of this evidence, Coleman's claim that a substantial number of leads point to another killer other than Coleman is baseless.  Nothing in the record suggests any other killer.
>
> The court also noted that Coleman's trial counsel faced an enormous task in representing Coleman given his propensity to talk to others about how he was going to kill Stevens, and then after the crime how he had in fact done so. *Coleman*, 85 Ohio St. 3d at 135.
>
> The evidentiary material does indicate that Stevens made drug buys for the police from other individuals in the Springfield area.  These other individuals however did not brag to their friends that they had "taken care of" Melinda Stevens.  Also we have examined

Ms. Almon's statement (Def. Ex. 17) and nowhere does Ms. Almon state that Melinda's daughter saw her mother shot. Ms. Almon said Rosa told her Lindsay was in Riddle's with her mother before her mother was killed. (Ex. 17, p. 3).

We agree with the trial court's finding that an evidentiary hearing was not necessary to resolve this claim. The evidentiary material does not provide evidence that Coleman was prejudiced by his counsel's conduct. The material does not suggest the reasonable probability that had counsel investigated these "leads" a different trial result would have occurred. The trial court properly overruled the twenty-first claim.

*State v. Coleman*, 2002 Ohio 5377 at ¶¶ 102-107 (2nd Dist. Ohio 2002).

Petitioner asserts that counsel failed to highlight the lack of physical evidence. (Traverse, Doc. No. 170 at PageID 1924.) He notes police never located a murder weapon, nor did the State provide any DNA evidence. *Id.* He argues that shoes introduced at trial were found three months after the murder, but were not weather beaten and seemed fairly new, so they could not have been at that location for a long period of time. He further argues that he was not asked to try on the shoes nor the flannel shirt. *Id.* This sub-claim is without merit as Petitioner fails to show the state courts' finding of a lack of prejudice is an objectively unreasonable application of *Strickland*. Even had counsel argued the lack of physical evidence, there is ample testimony in the record regarding the flannel shirt worn by Petitioner and cockleburs found on the shirt. (Trial Tr. Vol. 5 at 849-850, 888); (Trial Tr. Vol. 6 at 1015-1016, 1131.) Additionally. fellow inmate Steven Kasler testified that Coleman had told him that some of the clothing was left in the Strodeses' doghouse, the location in which the flannel shirt and a shoe were located by police. (Trial Tr. Vol. 5 at 886); (Trial Tr. Vol. 6 at 1107.) Furthermore, Coleman himself, as well as a witness, placed him at Riddle's Ribs with the victim around the time of murder. Additional

testimony related to Petitioner's plan to murder Stevens, as well as his statements after the murder that he had "taken care of business."

Next, Petitioner agues ineffectiveness in that an investigator was not hired until just before the start of trial. (Traverse, Doc. No. 170, PageID 1926.)  The investigator, Belcher, did not begin work on Coleman's case until February 10, 1997, which was the first day of voir dire and two days prior to opening statements. *Id*.   Once hired, Belcher allegedly lacked direction from counsel and did little by way of aiding in the mitigation phase, focusing primarily on finding an alibi for Coleman. *Id*. at PageID 1926.  Specifically, Belcher attempted to contact and interview three witnesses.  Two of these witness, Charles Foster and James Strodes, would have served as alternative suspects; however, they both refused to speak with him.  The third witness, Lynnda Gaskins, proved to be an inculpatory rather than an exculpatory witness. *Id*.   Assuming that the lack of time for a proper investigation fell below the standard of reasonableness under prevailing professional norms, Petitioner fails to show prejudice.  He does not show what evidence could have been discovered had Belcher had additional time to investigate and interview additional witnesses/suspects.   His theory that Belcher could have uncovered information for the alternative suspect defense is purely speculative.  The state courts' finding of a lack of prejudice is not an objectively unreasonable application of *Strickland*.

Next Petitioner argues that his counsel were ineffective because they failed to question key witnesses on inconsistencies in their testimony. (Traverse, Doc. No. 170, PageID 1928.) This failure allegedly resulted in a violation of his Sixth Amendment right to confront witnesses, and encompassed within this right, the right to cross-examination and ability to present a complete defense. *Id*., *citing Davis v. Alaska*, 415 U.S. 308, 315 (1974); *Olden v. Kentucky*, 488 U.S. 227, 231 (1988); *Douglas v. Alabama*, 380 U.S. 415, 418 (1965).  Petitioner asserts that

there were multiple occasions when trial counsel failed to impeach the State's witnesses with prior statements and/or prior testimony, including: inconsistent descriptions of clothing worn by Petitioner on the evening of the murder; that a witness told police that he knew Coleman but he failed to identify him as the man he saw with the victim, instead describing a man both taller and lighter than Petitioner; inconsistent testimony as to the description, actions, and inquiries of Petitioner regarding the gun on the evening of the murder; testimony as to how Coleman discovered that Stevens was the informant in his case; inconsistent descriptions of the language used after he allegedly committed the murder and described the event; inaccurate details given in police statements; and inconsistencies in testimony from the Petitioner's drug trafficking trial and Petitioner's capital trial. (Traverse, Doc. No. 170, PageID 1929-1931.)

In the first category Petitioner specifically alleges counsel's ineffectiveness in their failure to challenge witnesses as to their inconsistent description of Coleman. (Traverse, Doc. No. 170, PageID 1929.) Additionally, he notes the fact that not one of these witnesses recollected seeing the sling he was wearing for a six-week time period following a shoulder surgery on December 12, 1995. *Id*. On post-conviction relief, the state court of appeals held that:

> In his seventeenth claim, Coleman contends his counsel was ineffective in not effectively impeaching Christopher Holtz who placed him in the alley with Ms. Stevens just prior to her death. In support of that claim, Coleman offered Defendant's Exhibit 45 which purports to be a statement given by Holtz to police. It is not clear who prepared the handwritten statement. It appears to have been prepared by someone other than Holtz. It starts "Chris saw a man..." Holtz apparently described the man with Melinda Stevens as being 6 foot or better and 200-230 lbs. Coleman contends he is shorter and heavier than that and his counsel should have impeached him [Holtz] on this discrepancy. He also says counsel should have brought out on cross-examination that Holtz did not identify him though he knew him. Coleman refers us to page 847 of the transcript. The following testimony was given by Holtz at trial:

"Q:    And can you tell the Jurors how you knew Miss Stevens?

"A:    How I knew her?

"Q:    Yeah. How long had you known her?

"A:    Oh, not very long.  I just see her wandering around a couple times through an alley.

"Q:    Okay. Do you know an individual by the name of Tim Coleman?

"A:    Not closely.

"Q:    Okay. Do you know who he was?

"A:    Yeah.

"Q:    Okay. Now, when you were in the vicinity of Riddle's Ribs, did you have occasion to see either of those individuals?

"A:    In Riddle's."

The trial court overruled this claim finding there was no evidence that counsel's actions prejudiced Coleman.  We have reviewed the record and we agree with the court's resolution of this claim as well.  There is no evidence that Exhibit 45 is Holtz's statement to police.  There is no evidence that Coleman's height or weight differs significantly from that allegedly given by Holtz to police. The trial testimony does not plainly indicate that Holtz knew Coleman or Stevens by name.  It does suggest Holtz knew them from seeing them in the vicinity of Riddle's.  Coleman failed to demonstrate that counsel was ineffective in not properly impeaching Holtz such that an evidentiary hearing was necessary.

*State v. Coleman*, 2002 Ohio 5377 at ¶¶ 72-83, 2002 Ohio App. LEXIS 5396 (2nd Dist. Ohio 2002).

In regard to the identification, counsel were not ineffective in their failure to cross-examine on the minor inconsistencies in the description of the clothing.  In the police statements, as well as trial testimony, the witnesses all testified to a dark colored flannel shirt. (Return of

48

Writ, Doc. No. 167, Apx. Vol. 8 at 57); (Return of Writ, Doc. No. 137, Apx. Vol. 9 at 186);(Trial Tr. Vol. V at 849-850); (Trial Tr. Vol. 6 at 1131.) Nor were counsel ineffective in their failure to further question witness Christopher Holtz on his identification of Coleman. While his police statement did originally identify Petitioner as being taller and weighing less, he identified Petitioner in court. Furthermore, he testified to the fact that he did not know the Petitioner well, but rather had seen him around, which could account for why he did not identify Coleman by name in his statement to the police.

Similarly, during trial Vera Strodes, testified to the fact that Petitioner had been wearing a flannel shirt. (Trial Tr. Vol. 6 at 1015-1016.) She further recollected that he was wearing black pants, black shoes, a pair of gloves, and that the flannel shirt had cockleburs stuck all over it. She then identified a shirt as shown to her in court as the flannel shirt Petitioner had been wearing on the night of the murder. Here defense counsel did in fact challenge Strodes with inconsistencies from the prior description she had given to police:

> Q: Do you remember what you told the police about his shirt?
>
> A: Yeah, that it had cobwebs or cockleburs on them.
>
> Q: Cockleburs. Now, do you remember what color you told them it was?
>
> A: It was blue with checks on it.
>
> Q: You think you told them it was blue with checks on it?
>
> A: Yeah. It has checks in it. It's one of these flannel shirts.
>
> Q: This is a copy of your statement, one page, first page.
>
> A: Okay.

Q:      Okay.  And here they ask you the question, "He had on this black and white checkered flannel shirt."  Do you remember telling that to the police?

A:      I may have.

Q:      Okay.  Do you think this is closer to the truth, black and the white shirt?

* * * *

Q:      Okay.  So that you're saying black and white shirt wasn't correct?

A:      No.

Q:      I mean, that's obviously not a black and white shirt.

A:      No, it's not.

Q:      Why would you have told them black and white?


Mr. Collins:    Objection.  It's been asked and answered.

The Court:      Well, she indicated- - well, I'll let her answer the
                question.  If you said that, you may answer it.

A:      Uh-huh.  Because that - - at that time I was thinking black and white.  I mess with so many clothes during the day that it just - -something may stick there.


(Trial Tr. Vol. 6 at 1023-1025.)

Defense counsel clearly challenged Strodes on her prior statement.   The information was

before the jury and became a question of witness credibility to be determined by the finders of

fact. Petitioner has not shown prejudice from his trial counsel's failure to further examine Vera

Strodes on this matter.

50

As for Coleman's assertion that no witness described seeing his arm in a sling, it does not appear that this issue was addressed by the state courts. This Court notes that there is information present in the record that Petitioner had had shoulder surgery and as part of recovery was to wear a sling. However, there is no evidence of the fact that Petitioner did in fact wear the sling for the prescribed amount of time, or for that matter for any duration of time post-surgery. As such Petitioner cannot show prejudice or that there is a reasonable probability the outcome of trial would have been different had counsel questioned the witnesses on this matter.

In the second sub-set of inconsistencies, Petitioner alleges additional inconsistencies in Gaskins testimony. (Petition, Doc. No. 9, PageID 14.) The first discrepancy was when she testified that Coleman had discovered through a discovery motion that Stevens was the informant in his case, whereas she had previously told the police that Coleman refused to tell her how he had obtained that information. *Id*. In her statement to police she claimed, "I might have asked him a million times but I never did get to find out how he got this information. But come to find out his information was correct." (Return of Writ, Doc. No. 167, Apx. Vol. 9 at 189.) She later testified at trial that Coleman told her that Stevens was on his indictment and that he was now facing three counts of trafficking. She additionally went on to testify that he had brought his papers over to her house and that she had read them. (Trial Tr. Vol. 6 at 1124.)

Additionally, he points to inconsistencies in the circumstances surrounding his visit to Gaskin's home. (Petition, Doc. No. 9, PageID 14); (Traverse, Doc. No. 170, PageID 1930.) He contends there was a discrepancy in Gaskin's recounting of the conversation she and Coleman had had after he returned to her house after the murder. In both her interview with the police and her trial testimony she said that he had taken care of business with the girl, but in her statement to the police, she said he said, "pow pow, to the back of the head, and then he did like this boom and actually fell over on the floor. Made a loud noise. Said that is how that b*tch fell. That b*tch fell hard."

(Return of Writ, Doc. No. 137, Apx. Vol. 9 at 198.)    She told the police that the weapon had been a "nine."    During the trial, her testimony changed to Coleman's saying, "I took care of my business." "Bloop. Bloop, two to the back of the head." "The b*tch fell like a rock. Bloop." and then he fell on her floor to demonstrate. (Trial Tr. Vol. 9 at 1130.)  She indicated at this time that the murder weapon had been a .380.

He raised these sub-claims on post-conviction relief and the court held:

> In his eighteenth claim, Coleman contends his trial counsel were ineffective in not impeaching the trial testimony of Lynda Gaskins. Ms. Gaskins testified at the trial that she had known Coleman for about 8 or 9 years prior to the trial and saw him almost daily.  Ms. Gaskins said Coleman told her while he was in jail on the drug charges he learned through the discovery process that the confidential informant who he had sold the drugs to was Melinda Stevens. (Tr. 1120).  Ms. Gaskins testified that when Coleman got out on bond he told her that he was going to kill Melinda Stevens because he was facing too much time on the aggravated trafficking charges. (Tr. 1123, 1124).  Ms. Gaskins said Coleman came to her house on the night of the homicide at about 7:30 p.m. and told her that he "took care of my business." (Tr. 1129).  She testified as follows:
>
> "A:    Excuse me.  He - -he said - -he said, 'I took care of my business.'  He said, 'Bloop, bloop, two to the back of the head.' He said, 'The bitch fell like a rock. Bloop' Then he fell in the middle of my floor.
>
>
> "Q:    Wait a minute now. He said, 'Bloop, bloop." Then he said, 'The bitch' - -
>
> "A:    'Two to the back of the head.' And then he fell in the - - then he just fell over in the floor, said, 'She fell like a rock.'
>
> "Q:    Said she fell like a rock, and he actually physically fell to the floor?
>
> "A:    Yes."
>
> Gaskins testified that Coleman told her he shot Stevens twice in the back of the head in the alley behind Riddle's. (Tr. 1136).

In aide [sic] of his petition, Coleman filed a copy of Gaskins' statement to the police on April 5, 1996.  In her statement she said Coleman told her Stevens was the informant who bought the drugs from him but "I never did get to find out how he got this information."  In her lengthy statement Gaskins told police that Coleman explained he took care of his business, "Pow, pow. Twice to the back of the head with a nine.

Coleman contends his trial counsel were ineffective in not impeaching Gaskins with the statement she gave to the police in April 1996.  The trial court overruled this claim finding that the claimed inconsistencies were insubstantial and in any event there was no reasonable probability that the outcome of Coleman's trial would have would have been different had counsel pursued this line of impeachment in cross-examination.

It is clear that Gaskins' trial testimony that Coleman said he learned of Stevens' identity through the discovery process in his drug case was not consistent with her police statement.  Gaskins' trial testimony of how Coleman described the killing of Stevens was substantially consistent with her police statement.  We doubt whether the single inconsistency in Gaskins' testimony would have had any significant impact on the jury's evaluation of her testimony.  The trial court properly overruled this claim as well.

*State v. Coleman*, 2002 Ohio 5377 at ¶¶ 72-83, 2002 Ohio App. LEXIS 5396 (2nd Dist. Ohio 2002).

Counsel could have cross-examined Gaskin on the points concerning how and when Coleman found out that Stevens was an informant on his drug case and on the type of gun used.  However, given the evidence against Petitioner and the corroboration of Gaskins' statement by other witnesses, Petitioner cannot show prejudice from this failure.  While this may have slightly affected her credibility with the jury, other witnesses testified that Coleman had told them of the murder, and testified to the type of gun that was used.  Additionally, the pathologist testified that he recovered the bullets from the victim's body and that the placement of the wounds would support the version of the events in which Stevens' spinal cord was severed and she fell to the ground. (Trial Tr. Vol. 4 at 691.)  A forensic examiner testified that the recovered bullets were

from a .380 caliber weapon. (Trial Tr. Vol. 6 at 1053.)  As this other evidence supported Gaskins' testimony,  Petitioner cannot show that there is a reasonable probability the outcome of trial would have been different had counsel questioned her on these inconsistencies.

Next Petitioner claims counsel were ineffective in their failure to impeach Steven Kasler with his prior inconsistencies,  specifically, in that Kasler had told the police that the victim, Stevens, was white, that she had been shot a second time after she hit the ground, and that Coleman's nephew would serve as his alibi. (Traverse, Doc. No. 170, PageID 1930-1931); (Return of Writ, Doc. No. 167, Apx Vol. 9 at 212.)  On post-conviction relief, the court of appeals held:

> In his nineteenth claim, Coleman contends his trial counsel were ineffective in failing to impeach Steve Kasler with a prior statement he gave to police.  Kasler testified at the trial that he was a cell mate of Coleman at the Columbus Reception Center for a day.  He testified that Coleman told him he shot Melinda Stevens twice in the back of the head with a Davis P-380. (Tr. 1106).  He denied he was receiving any consideration from the State of Ohio for his testimony.
>
> In a statement given by Kasler to police on June 20, 1996, Kasler said the informant was white.  Coleman contends counsel should have impeached Kasler with this statement since Melinda Stevens was an African-American.  Coleman says counsel should have impeached Kasler with his statement that Coleman told him he talked to Edward Tilley before and after the killing since he did not mention this in his trial testimony.  Coleman says counsel should have impeached Kasler with his statement that Coleman told him his nephew was to be his alibi since Coleman's nephew did not testify at trial.
>
> We agree with the trial court's resolution of this claim as well.  This claim is difficult to comprehend.  While counsel might have impeached Kasler with his prior statement that Coleman told him the victim was white, we fail to see how counsel could have impeached Kasler with other aspects of his statement.  In any event, there is not substantial probability that had counsel pursued this single line of impeachment of Kasler the trial outcome would have been different. *Strickland v. Washington, supra.*

*State v. Coleman*, 2002 Ohio 5377 at ¶¶ 94-96 (2nd Dist. Ohio 2002).

While these issues would have gone to Kasler's credibility with the jury, the majority of his testimony was corroborated by many witnesses. Coleman has not shown that there is a reasonable probability that, but for counsel's failure to cross-examine on these inconsistencies, the result of the proceeding would have been different. The decision by the state court was neither contrary to, nor an unreasonable application of, Supreme Court law.

Next, Coleman cites to contradictions in James White's testimony, specifically inconsistencies as to when Coleman approached him about helping to kill Stevens. (Traverse, Doc. No. 170, PageID 1931-32.) White testified during the drug trial that he and Coleman had discussed multiple ways of killing Stevens. However, in the murder trial, White testified that they had only discussed two methods. Additionally, during the murder trial, White provided specifics as to these murder plans which he had not testified to during the drug trial. Also, during the murder trial, White omitted mention of Coleman's nephew providing a potential alibi as he had previously testified to in the drug trial. *Id.*

This ground was presented to the state courts during post-conviction relief. The court of appeals held:

> In his twentieth claim, Coleman contends his trial counsel were ineffective in not effectively impeaching the testimony of James White. During the trial, White testified that Coleman approached him while they were in jail and offered to help get him out on bond if White would help him take care of Ms. Stevens. (Tr. 722). White testified that when he and Coleman got out of jail he and Coleman discussed plans of killing Stevens but he never had any intention of carrying out the plan. (Tr. 725-727). He said Coleman gave him crack cocaine on several occasions during the discussions. (Tr. 725). White said he saw Coleman on the night of the homicide and Coleman said he "took care of his business." (Tr. 730).

Coleman argues that his counsel should have impeached White with his testimony given at Coleman's trafficking trial because at that trial White's recollection was so poor that he was unable to recall how many times he and Coleman talked about "getting rid" of Ms. Stevens. (95-CR-0484-Tr. p. 326). Coleman notes that at his murder trial White was able to remember that the shooting was to occur on Wiley Avenue. (Tr. 724).

We fail to see how trial counsel was ineffective in impeaching the testimony of White. White testified at the drug trial and at the murder trial that he couldn't remember how many times he and Coleman talked about the plan to kill Stevens. He said "I didn't keep count." (Tr. 735). We fail to see how White's remembering the planned location of the planned killing (Wiley Street) was inconsistent with his inability to remember how many times they had discussed the plan. The trial court properly overruled this claim as well.

*State v. Coleman*, 2002 Ohio 5377 at ¶¶ 97-99 (2nd Dist. Ohio 2002).

In the drug trial White testified that he and Coleman had been housed together in the jail while Coleman was being held on charges of trafficking. Coleman confided to White that he thought he knew who had "busted" him. (Drug Trial Tr. Vol. 3 at 322-323.) He further told White that once he (Coleman) was released from jail he planned to take care of his business with Melinda Stevens because he had young children and could not serve a lengthy sentence as they would be grown by the time he was released. *Id.* at 324. White claimed that after they were out of jail, Petitioner approached him to seek help in killing Stevens. *Id.* at 324, 331. In exchange Coleman would pay White in drugs and in assistance leaving town. *Id.* at 324. The men discussed a few different methods of killing, including throwing a fire bomb into her home and the possibility of someone hiding in the bushes and then shooting her as she came by. *Id.* at 325-326, 334. The plans were discussed on several occasions, though White did not think Coleman was serious about the plan. *Id.* at 325-326. On the day of the murder Coleman told White that he

56

was going to take care of it.  White did not see him again until after the murder had been committed. *Id*. at 326-327.

During the murder trial, White testified that the initial conversations regarding Stevens took place in jail. (Trial Tr. Vol. 5 at 722.)  Coleman told him that he believed that Stevens was the one who had "busted him" and that because he had a newborn, he could not do that much time. *Id*.  He offered that if he were released from jail first, he would help with White's release, on the condition that White help him take care of Stevens. *Id*.  At the time there were no further conversations as to the specifics. *Id*.  Once they were both out on bond, Coleman again asked White to help him with Stevens. *Id*. at 723-724.  Again he testified that they discussed setting the house on fire or hiding in bushes and shooting her. *Id*. at 724-726.  He stated he only continued discussions with the plan because he was given drugs. *Id*. at 725, 727, 735.  He saw Coleman on the day the murder took place, but did not participate in the murder. *Id*. at 728-731.

In comparing the two versions of trial testimony, the Court finds very little discrepancy. Counsel could have cross-examined White as to the timing of the first conversation.  However, in both cases White testified that any specifics as to the plan were discussed outside of jail.  Even if the jurors had been made aware of this inconsistency, it does not seem likely, given the strength of the evidence presented, that the outcome would have been different.  Counsel were not ineffective for failing to follow this line of questioning and the state courts were not objectively unreasonably applying *Strickland* when they reached that conclusion.

Next Coleman argues that counsel were ineffective in that they should have challenged the inconsistencies in Hope Strodes' testimony concerning the gun. (Traverse, Doc. No. 170, PageID 1929), specifically, that in her police statement, Strodes said that Coleman was cleaning a gun which looked like a silver 9mm. semi automatic. (Return of Writ, Doc. No.167, Apx. Vol

V at 34.)  During trial however, she did not testify that Coleman was cleaning a weapon, but rather stated that he came into her kitchen and was looking for bullets. She told him there was a box of bullets on the top shelf. (Trial Tr. Vol. 6 at 949.)  She recalled the gun as being silver in color with a clip. *Id*. at 950-951.   On cross-examination, defense counsel asked Strodes if she had told the police all of this when she talked to them and gave her statement.  When she answered in the affirmative, counsel continued cross by saying "you did? . . . you didn't tell him about he was looking for bullets.  He just came to your house and asked for bullets- - came to your grandmother's house and asked for bullets; is that right?"  "[Y]ou didn't want to tell them nothing.  You told them most things, but you didn't tell them about the bullets; is that right?" *Id*. at 954-956.  The State then attempted to rehabilitate this witness by asking her why she did not want to tell the police about this, to which she replied that she did not want to be involved. *Id*. at 956.  Defense counsel did not re-cross on this point.

Counsel effectively questioned this witness on her inconsistent statements regarding Coleman's actions with the gun.  This exchange was before the jury and the question of credibility was to be determined by the jury.  As for the type of gun, Petitioner cannot establish prejudice.  While counsel could have asked about this discrepancy, her description of the gun remained similar, a small silver gun. In addition, several other witnesses testified that a .380 was used in the murder.

Next Petitioner argues that counsel were ineffective in failing to question the possibility of police bias and deals as inmates who testified may have received lighter sentences. (Traverse, Doc. No. 170, PageID 1933.)  In support, he offers an affidavit from Kinsely Crowley stating that police offered to help him with his time if he would say that he saw Coleman murder Stevens. (Traverse, Doc. 170, PageID 1933-1934, *citing*  Return of Writ, Doc. No. 167, Apx. 7 at

130, Aff. of Crowley.)  Additionally, Petitioner asserts that William Love overheard an inmate at the jail, who was going to testify against Coleman, telling other inmates that their sentences would be reduced if they would testify against Coleman as police needed two more witnesses. (Traverse, Doc. No. 170, PageID 1933-1934, *citing* Return of Writ, Doc. No. 167, Apx. Vol. 8 at 328, Aff. of Love.)  He claims that one inmate accepted this offer and was provided details of the crime so he could testify. (Traverse, Doc. No. 170, PageID1933.)  He further alleges that this sub-claim is supported by the fact that the witnesses in this case were in fact given relatively light sentences. *Id*. at PageID 1934.   Petitioner additionally points to the fact that during his drug trial, James White testified that he was getting a reduction in his sentence for coming forward about Stevens' murder.  Coleman notes that if this was the case for White, it is possible that Donovan Hays and Antwan Warren also got deals. (Traverse, Doc. No. 170, PageID 1934.)

Coleman raised this claim in the state court and it held:

> In his seventh claim, Coleman contended that his counsel were ineffective in not investigating allegations that police improperly influenced  Kinsley Crowley, Larry Terrell, William Love, and Dana Strodes to lie in order to implicate him in the murder of Melinda Stevens. Coleman presented the affidavit of Kinsley Crowley, an inmate, who stated in an affidavit dated October 30, 1997, that Detective Smoot told him "he would help me for my time if I said I saw Tim kill Melinda." (Def. Ex. 10).

> In its motion for summary judgment, the State presented the affidavit of Detective Nathaniel Smoot who swore he never threatened any witness to testify in a certain manner, nor to influence their testimony by any promises of leniency.  The State also presented the typed interview of Crowley conducted by Detective Smoot and Flores on January 10, 1996.  In this interview Crowley stated he saw Coleman and his cousin Melinda Stevens leave Riddles together about five minutes before Chris Holtz discovered Melinda's dead body.  The State asserted in its motion that no criminal charges were pending against Crowley at the time he made his statement to the Springfield detectives in January 1996.

* * * *

Coleman presented the affidavit of William Love who stated in an affidavit dated December 22, 1997, that he was an inmate in the Clark County Jail in 1996 and was told by an unnamed inmate that inmates' sentences would be reduced if they testified against Coleman. He stated he heard a younger inmate agree to help out and later detectives took him out and interviewed him. He stated he didn't know whether the prosecution or police actually did offer such a deal to anyone.

* * * *

In granting summary judgment on Coleman's seventh claim, the trial court noted that the record failed to disclose any substantial facts to support this allegation of ineffectiveness on counsel's part. We agree that the record fails to establish any evidence that police sought to improperly influence any of the witnesses who offered their affidavit or that the Doughtys were ever aware of any such claim of misconduct by the police. The trial court properly overruled the seventh claim without an evidentiary hearing.

*State v. Coleman*, 2002 Ohio 5377 at ¶¶ 27-33 (2nd Dist. Ohio 2002).

James White testified that in his own case several charges of aggravated trafficking were dismissed as part of a plea bargain. His plea bargain was conditioned on his cooperation and testimony in Coleman's case. (Trial Tr. Vol. 5 at 718.) He testified that, aside from that particular plea bargain, no other deals or bargains had been made. *Id*. During trial, Hayes testified that he was not given any consideration or a plea bargain in his own case in exchange for his testimony against Coleman. (Trial Tr. Vol. 5 at 742-743.) Counsel did not cross-examine Hayes on this point. Likewise, Warren testified that he was not being offered a plea bargain or any consideration in his own drug trafficking case in exchange for testifying in Coleman's case, though he did note that the judge in his case would be aware of that fact that he had testified in Coleman's case. (Trial Tr. Vol. 6 at 1092.) On cross-examination defense counsel asked

60

"[d]idn't James Strodes tell you if you wanted time knocked off your sentence . . .to turn on Tim?"  Warren responded negatively to this assertion. *Id*. at 1099.

Petitioner has not shown any deficient performance or prejudice in the failure of counsel to cross-examine further on this point.  Aside from the offered affidavit, there is no evidence that Hayes or Warren received a deal in exchange for their testimony.  White expressly stated that his testimony was a condition of his plea bargain.  This information, in addition to Hayes' and Warren's denial of receiving deals, were all before the jury. Without more to the contrary, counsel were not ineffective in their failure to further question potential deals.  This sub-claim is without merit.

Next, Coleman argues that his counsel were ineffective in their failure to consider and present alternative suspects as a defense. (Traverse, Doc. No. 170, PageID 1934, 1953.)  Even prior to the Sapp affidavit, he alleges there was evidence pointing to other potential perpetrators. (Traverse, Doc. No. 170, PageID 1934.)  Had counsel been thorough in looking through the discovery evidence, they would have discovered that Stevens was working as an informant and buying from multiple sellers, including: Shawn Cunigan,[1] Juan Bell, Cynthia Lawson, Charles Foster, Gary Cooper, Chippy Vincent West, and Lucretia Dickerson. (Return of Writ, Doc. No. 167, Apx. Vol. 7 at 126.)  Additionally there was information[2] that Stevens had been threatened by Charles Foster only two days prior to her death.

Petitioner raised this claim on direct appeal and the court held:

> Coleman attempts to present additional evidence that allegedly points to other suspects and to inconsistencies in testimony.  Yet

---

[1] Throughout the record this name appears as both "Shaun" and "Shawn."  For purposes of this opinion, this Court will use Shawn.

[2] This evidence came from an anonymous phone call to police from someone that overheard the exchange, as well as through an extensive police interview of Charles Foster. (Return of Writ, Doc. No. 167, Apx Vol 7 at 97);(Return of Writ, Doc. No. 167, Apx. Vol. 8 at 55.)

his claims are speculative at best and reset largely upon evidence that was not before the trial court and that cannot be considered by this court. *State v. Ishmail*, 54 Ohio St. 2d 402, 8 Ohio Op. 3d 405, 377 N.E. 2d 500, paragraph one of the syllabus. Viewed in a light most favorable to the prosecution, the state clearly demonstrated sufficient evidence to convict the appellant. Thus, we reject appellant's second proposition of law.

*State v. Coleman*, 85 Ohio St. 3d 129, 140 (1999).

Coleman again raised the claim in post conviction and the court of appeals held:

In the direct appeal, Coleman asserted that his counsel was ineffective for not pursuing a substantial number of leads pointing to another killer. The Supreme Court found this claim to be baseless. *State v. Coleman*, *supra*, at 134. Nothing in the post-conviction evidentiary material suggests counsel was ineffective in not pursuing other "leads." The trial court properly rejected Coleman's ninth claim as well.

* * *

In his twenty-first claim, Coleman contends his trial counsel were ineffective in not investigating other suspects who had a similar motive as he had for killing Melinda Stevens. Coleman points to the statement of Charles Foster who was interviewed by Springfield Police shortly after the homicide. In that statement, Foster admitted he told Melinda Stevens she would wind up dead for snitching for the police. (Ex. 3 pages 6, 17). Coleman points out that Shaun Cunigan gave a statement to the police also admitting that he bought drugs from Stevens and he admitted to being in Wiley's alley just prior to the homicide. Coleman points out that "Corky" and "Fat Dean" also bought drugs from Stevens and both were in Springfield at the time of her death. He also points out that Monica Roe told police she and Melinda were riding around with two drug dealers from Dayton on the evening of her death. Coleman also points out that there were reports to police that Ms. Stevens' eleven year old daughter witnessed her mother's killing. (Ex. 17, p.4).

The trial court overruled this claim because the court found there was overwhelming evidence of Coleman's guilt in the trial record.

*State v. Coleman*, 2002 Ohio 5377 at ¶¶ 39, 100-101 (2nd Dist. Ohio 2002).

In his Traverse, Coleman lists the following as potential alternative suspects or possible leads:

1.     Ms. Stevens bought drugs from Charles Foster. (Apx. Vol. 7, p.126) Foster threatened Ms. Stevens two days prior to her death. (*Id*. at 102. Apx Vol. 8, p. 55)

2.     Ms. Stevens bought drugs from Shawn Cunnigan (Apx. Vol. 7, p. 126) Cunnigan was in the alley where Ms. Stevens was killed just prior to her death. (Apx. Vol. 9, p. 232)

3.     Both Foster and Cunnigan used the name "Dave." (Apx. Vol. 7, p.126; Apx. Vol. 9, p. 231) During police questioning of Coleman, Sergeant Graeber indicated "Dave's probably my guy." (Apx. Vol. 5, p. 14 (Trial Ex. S))

4.     Corky and Fat Dean were in the area, two men whom Ms. Stevens informed on. (Apx. Vol. 7, p.100)

5.     Kirkland (Kirky) was in the area looking for Ms. Stevens just prior to her death. (*Id*. at 109)

6.     Monica Roe indicated that she and Ms. Stevens were riding around with two drug dealers from Dayton on the evening of her death (Apx. Vol. 9, p. 271)

7.     Two men from Michigan came down to kill Ms. Stevens. (Apx. Vol. 1, p. 124)

8.     Kent from Dayton told Ms. Almon that Ms. Stevens was going to get killed. (*Id*. at 152.)

9.     Tammi Rowe and Charles Chilton knew how Ms. Stevens was killed. (Apx. Vol. 9, p. 284)

10.     Police received several reports that Ms. Stevens' daughter witnessed her murder. (Apx. Vol. 7, p. 149; Apx. Vol. 9, p. 285) There were also reports that two girls ran from the alley. (Apx. Vol. 9, p. 286)

11.     Tim Cook hired Mike Harris to shoot Ms. Stevens over some money she owed over drugs. Also, heard Kinsely or

Kneisley was given the gun and money taken from Ms. Stevens and was told to get rid of it. (Apx. Vol. 8, p.60)

12.  James Strodes told police he was not involved in Ms. Stevens' death, but was at his Uncle Wallace's working with Larry Torrell [sic]. (Apx. Vol. 5, p.70) Larry Terrell indicated by letter to Petitioner that he was not with Strodes. (See also Apx. Vol. 7, p. 131)

13.  Counsel did not challenge the State's assertion that Petitioner did not make a call from the payphone at the corner of Center and Pleasant.  Susan Smith, Petitioner's girlfriend, worked at Cardinal Retirement.  The number of Cardinal Retirement was 399-1216.  Review of States Ex. U reflect two phone calls made to local 1216 number. (See also Apx. Vol. 7, p. 174)

14.  Ms. Stevens owed drug dealer "Smalls" money for drugs. When she failed to hold-up Riddle's, Smalls shot Stevens in the head. (*Id*. at 125)

15.  Timothy J. Hope was a potential suspect or accomplice. Hope had a gold tooth and left for Tennessee after the shooting. (Apx. Vol. 8, p. 59)

(Traverse, Doc. No. 170, PageID 1935-1936.)

This sub-claim deals with street rumors and third-hand accounts with no evidence in support. The Court further notes that police interviewed Foster regarding his comments to Stevens days prior to her murder.  The interview, as well as that of Cunigan, proved to be inculpatory against Coleman. Given the weight of evidence against Coleman, the alternative suspect evidence upon which he relies is speculative and not sufficient to demonstrate a reasonably probability that, but for counsel's failure to present this evidence, the result of the trial would probably have been different.

Next, Petitioner alleges ineffectiveness as counsel failed to challenge the testimony regarding calls made from a pay phone near Riddle's. (Traverse, Doc. No. 170, PageID 1936.)

Coleman's alibi was that after leaving Stevens, he went to a pay phone and made a call. *Id.*  The State asserted that the phone call was never made, defense counsel challenged this assertion, but failed to present any evidence corroborating this position. *Id.*  Specifically, it is alleged counsel could have shown that Petitioner called his girlfriend at her place of employment. *Id.* Petitioner offered his own affidavit, as well as one from Susan Smith, both of which stated that Coleman called Smith at her place of employment around 7:30 on the night of the murder to ask her to "play the numbers" for him. (Return of Writ, Doc. No. 167, Apx. Vol. 7 at 159-160, 174.) Petitioner stated that he made this call from the pay phone at Center and Pleasant. (Return of Writ, Doc. No. 167, Apx. Vol. 7 at 160.)  He claims to have made several calls at that time.  His first call was to a woman named Anita but as she was not home, he left a message with her mother. *Id.*  Next he called Richard McWhorter and then Susan Smith. *Id.*  However, at trial, Roger Engle, an employee at Ameritech, testified that two phone calls were made from the pay phone on South Central Street. (Trial Tr. Vol. 6 at 1079-1083.)  The calls were made a few minutes before 7:00 p.m., one of which went to the personal residence of Laura McNeil  and the second was a self-automated call back to Ameritech to report how much money was in the phone money box.  *Id.*  McNeil testified that on the evening of January 2, 1996, she received a call from her babysitter to let her know that the babysitter was stuck in the snow storm on or near Pleasant Street. *Id.* at 1085-1088.

Even if counsel had presented evidence of Coleman's claim that he had called Susan Smith, he cannot show prejudice.  The records from the phone only indicate two outgoing phone calls from the relevant phone on the evening of January 2, conflicting with Coleman's claim. Given the weight of evidence against Coleman, the ineffective assistance claim relating to the phone call to Susan Smith was not sufficient to demonstrate that but for counsel's failure to

present this evidence, there was a reasonable probability that the result of the trial would have been different.

Next, Petitioner alleges counsel's ineffectiveness in their failure to keep promises to the jury, specifically in telling the jurors during opening statements that they were going to hear from Charles Foster. (Traverse, Doc. No. 170, PageID 1937.) Foster was a local drug dealer and had threatened Stevens just days prior to her death. *Id.* Counsel further told the jurors that police had received an anonymous tip implicating Foster in the murder. (Trial Tr. Vol. 4 at 659.) Counsel did not follow up on this promise but rather failed to offer any evidence during trial to support this assertion. (Traverse, Doc. No. 170, PageID 1937.) Coleman blames this oversight on a lack of preparation, specifically in the delay of hiring an investigator. (Traverse, Doc. No. 170, PageID 1938.) In an earlier Opinion and Order, this Court held:

> The facts and evidence before the Court suggest that petitioner has at least some basis to question counsel's performance in connection with the culpability phase. For example, promising during opening statements to offer compelling alternative suspects, i.e., Charles Foster, and then failing to deliver on those promises calls counsel's decision-making and preparation into question. The record does not indicated whether counsel's decision and omissions in connection with their pretrial investigation and trial performance were calculated and reasonable, or, as petitioner suggests, neglectful and unreasonable.

(Opinion and Order, Doc. 54 at 26.)

However, Petitioner is unable to establish prejudice. Based on the police statement, Foster would have testified that "Tim" had told him that he was the one who had killed Stevens. (Return of Writ, Doc. No. 167, Apx. Vol. 7 at 97.) He further stated that "Tim" told him that he killed her because "she told on him" so he "he took care of business." *Id.* at 98, 104-106. Given

this, it is highly unlikely that but for counsel's failure to deliver on the promise of Foster's testimony, the result of the trial would have been different.

Next, Petitioner argues that trial counsel exhibited racial animus toward him. (Traverse, Doc. No. 170, PageID 1939.)  He alleges that counsel referred to him as "a typical stupid nigger" while improperly discussing his case with another client. *Id.*, *see also* Return of Writ, Doc. No. 167,  Apx. Vol. 7 at 141-142, Apx. Vol. 8 at 79-80.  He further alleges that counsel only went through the motions in his case so that they could begin to work on another capital case. *Id.*  This claim was raised in post-conviction relief and the court held:

> In his eighth claim Coleman contends his trial counsel were ineffective because they admitted to John Stojetz that they hurried through Coleman's case so they could begin work on his case.  In support of this allegation, Coleman submitted the affidavit of John Stojetz (Def. Ex. 14).  In the affidavit Stojetz stated he was represented by the Doughtys in a capital murder case and during a recess he said he asked Jon Doughty if he thought he might get the death penalty.  Stojetz said Doughty replied, "No, Coleman was a typical stupid nigger."  He said Doughty said Coleman told several people in a bar that "he killed the bitch, she won't tell on me no more." Stojetz said Doughty said in light of Coleman's remarks he "just went through the motions" with the Coleman case.  Stojetz said Doughty told him he wanted the Coleman case finished so he could begin work on his trial. The State countered with Jon Doughty's affidavit where he stated he spent between 350-400 hours working on Coleman's case.  Doughty emphatically denied all of Stojetz allegations.
>
> In denying the eighth claim, the trial court noted that Stojetz is a convicted felon on death row for the murder of a prison inmate and the Doughtys were his counsel and he had an obvious reason to further his position.  The court stated that it found Stojetz's statements suspicious and without credibility.  The court fully credited Doughty's affidavit and noted that any inconsistencies in the state's evidence were identified.
>
> Again *State v. Calhoun* is a basis for overruling Coleman's claim. The trial court was in the best position to view the conduct of trial counsel and whether counsel appeared adequately prepared to

> address the State's case and to present evidence in Coleman's
> behalf.  The eighth claim was properly denied without a hearing.

*State v. Coleman*, 2002 Ohio 5377 at ¶¶ 34-36 (2nd Dist. Ohio 2002).

Coleman fails to establish either prong of *Strickland*, to wit, that counsel were ineffective

or that he was prejudiced as a result.  The only evidence supporting this assertion is an affidavit

from Stojetz.  Trial counsel denied the allegations contained within the affidavit and countered

that they had worked for several hundred hours on Coleman's case.  The state court determined

the credibility of the affidavit and of counsel.  In considering this claim with the record, there is

no evidence of counsel's falling below reasonable standards or demonstrating a racial animus

toward Petitioner.  Nor does Coleman attempt to establish prejudice.  The decision of the state

courts was neither contrary to nor an unreasonable application of *Strickland*.

Next Coleman argues that his trial counsel were deficient in their failure to sever his

weapons under disability charge. (Traverse, Doc. No. 170, PageID 1939-1940.)  As a result of

this failure, the jury learned that Coleman was previously convicted of drug trafficking in 1993.

*Id*.  This may have resulted in the jury inferring that Coleman had a propensity to commit drug

crimes, making it more likely that he sold drugs to Stevens and murdered her to keep her from

testifying against him. *Id*.

Coleman raised this claim on direct appeal and the Ohio Supreme Court held:

> Appellant claims that his counsel was ineffective for failing to
> request severance of Count II of the indictment, having a weapon
> under disability.
>
> Under Crim.R. 8(A), joinder of offenses is proper where the
> offenses are "based on the same act or transaction."  The law
> favors joining multiple criminal offenses in a single trial. *State v.
> Franklin* (1991), 62 Ohio St. 3d 118, 122, 580 N.E.2d 1, 5.  In
> Coleman's case, joinder was appropriate, since the weapons under
> disability charge was based upon the same act as the aggravated

murder charge, that is, appellant shot and killed Stevens with a gun, which he was not permitted to have due to a prior conviction in 1994 for dealing drugs.

Had counsel requested severance, the trial judge could have properly denied any motion to sever, had one been made. A defendant must affirmatively establish prejudice and an abuse of discretion where the trial court refuses to sever multiple charges. *State v. Lott* (1990), 51 Ohio St. 3d 160, 163, 555 N.E.2d 293, 298; *State v. Torres* (1981), 66 Ohio St. 2d 340, 20 Ohio Op. 3d 313, 421 N.E.2d 1288, syllabus. Appellant cannot show prejudice in this case. The state was required to prove that appellant sold drugs to Stevens and that he subsequently killed her in order to prevent her from testifying against him. Given the fact that the jury would hear of appellant's previous drug dealing, appellant was not prejudiced by proof of an earlier drug conviction. See, e.g., *State v. Davis* (1988), 38 Ohio St. 3d 361, 528 N.E.2d 925. Moreover, "an accused is not prejudiced by joinder when simple and direct evidence exists." *State v. Franklin*, 62 Ohio St. 3d at 122, 580 N.E.2d at 6. In this case, proof lacks merit, as it fails to establish either deficient performance of duty of prejudice under *Strickland*.

*State v. Coleman*, 85 Ohio St. 3d 129, 137 (1999).

Even assuming that counsel had erred in not asking for a severance, Petitioner cannot establish prejudice as evidence of his drug trafficking in this particular case was already before the court in establishing that Stevens had been an informant and had purchased drugs from Coleman. Furthermore, in establishing motive for the murder, the jurors were told of the trafficking charges. The decision of the state court was not contrary to, nor an unreasonable application of U.S. Supreme Court law.

Next, Petitioner argues counsel's ineffectiveness during jury selection. (Petition, Doc. No. 9, PageID 19); (Traverse, Doc. No. 170, PageID 1940-1944.) Coleman alleges that his counsel failed to ensure the fairness and impartiality of jurors and that "[t]heir inadequate performance makes it impossible to tell from the record whether Coleman's jurors were fair and impartial." *Id*. at 1941.

Coleman raised this sub-claim on direct appeal and the court held:

> Coleman contends that his counsel failed to adequately voir dire prospective jurors. However, Coleman fails to demonstrate that counsel's performance fell below "an objective standard of reasonable representation." *State v. Bradley*, 42 Ohio St. 3d 136, 538 N.E.2d 373, paragraph two of the syllabus. As we have noted, "the conduct of voir dire by defense counsel does not have to take a particular form, nor do specific questions have to be asked." *State v. Evans* (1992), 63 Ohio St. 3d 231, 247, 586 N.E.2d 1042, 1056. Counsel exercise discretionary judgment when they question jurors and "need not repeat questions about topics already covered by * * * opposing counsel, or the judge." *State v. Watson* (1992), 61 Ohio St. 3d 1, 13, 572 N.E.2d 97, 108. Here, counsel had the benefit of questionnaires filled out by each juror. This court "will not second-guess trial strategy decisions" such as those made in voir dire. *State v. Mason* (1998), 82 Ohio St. 3d 144, 157, 694 N.E.2d 932, 949.

> Coleman complains that counsel in voir dire mischaracterized the nature and purpose of mitigation evidence. However, Coleman mostly cites examples of individual voir dire of venirepersons who never sat as jurors. Under the circumstances, these asserted misstatements by counsel could not have affected the verdict. As for the two jurors mentioned by Coleman that were on the jury, Coleman claims that counsel was deficient because of misstatements made while questioning individual jurors as to mitigation and the burden of proof. However, the trial court later correctly instructed the jury on the burden of proof and sentencing procedures, and a jury is presumed to follow the instructions given to it by the trial judge. *State v. Loza* (1994), 71 Ohio St. 3d 61, 75, 79, 641 N.E.2d 1082, 1100, 1102-1103. Additionally, asking jurors their views on individual mitigating factors "is not essential to competent representation." *State v. Phillips* (1995), 74 Ohio St. 3d 72, 86, 656 N.E.2d 643, 659. See, also, *State v. Goff* (1998), 82 Ohio St. 3d 123, 140, 694 N.E.2d 916, 929. Counsel also exercised discretion as to questioning a prospective juror who never sat on the jury about a relationship with an unrelated murder victim. "Trial counsel stands in the better position to determine which members of the venire merit in-depth examination." *State v. Phillips*, 74 Ohio St. 3d at 85-86, 656 N.E.2d at 659. Accord *State v. McGuire* (1997), 80 Ohio St. 3d 390, 398, 686 N.E.2d 1112, 1119.

> Coleman claims that his counsel did not ensure the fairness of jurors or inquire as to their views on the death penalty.  Again, Coleman generally cites only examples of alternates or prospective jurors who never sat on the jury.  Logically, individual voir dire of venirepersons who never sat on the jury cannot affect a verdict. Coleman fails to establish prejudice. *Bradley, supra.*
>
> In fact, the record shows that counsel generally did question those individuals who sat on the jury about their death-penalty views. Thus, Coleman's complaints "mostly amount to hindsight views about how current counsel might have voir dired the jury differently." *State v. Mason*, 82 Ohio St. 3d at 157, 694 N.E.2d 949.

*State v. Coleman*, 85 Ohio St. 3d 129, 135-136 (1999.)

Petitioner specifically cites to the following example, that potential juror Roush indicated that she knew Phree Marrow, a young girl that had been murdered. (Traverse, Doc. No. 170, PageID 1941.)  Petitioner cannot show prejudice as Ms. Roush did not serve as a juror in this case.

Petitioner next asserts that his counsel were ineffective in their failure to properly voir dire Juror Wilkerson regarding his response on his jury questionnaire. (Traverse, Doc. No. 170, PageID 1941.)

> In his fourth ground for relief, Coleman argues that his appointed trial counsel Jon and James Doughty were constitutionally ineffective for permitting a juror to sit on his case who had disclosed in his questionnaire that he was "related to or a close friend of" the county prosecutor or his staff.  In support of this claim, Coleman submitted a copy of the questionnaire. (Defendant's Exhibit 13.)  The juror, Jesse A. Wilkerson disclosed that he was 21 years old and was of the African American race. Wilkerson answered yes to the question of whether he was related to or was a close friend of the County Prosecutor or a member of his staff.
>
> The State argues that Coleman failed to make out a claim for ineffectiveness on this claim because Wilkerson consistently stated

he would be fair and impartial and that counsel may have wished to keep him on the jury because he was a young, African-American male like Coleman. The State noted that Coleman's counsel objected to the State's use of peremptory challenges to some black jurors leaving Wilkerson as the only black juror.

The trial court denied Coleman's fourth claim because there was no evidence that Wilkerson would be anything but fair and impartial and counsel may have wished to have a young black man serve on the jury. We agree with the trial court that it is certainly within the range of reasonable representation for Coleman's counsel to have concluded that Wilkerson's relationship with the prosecutor's office was outweighed by the desire of having at least one black juror on the jury. (The record indicates Coleman was a 26 year old black male at the time of his arrest.) The Supreme Court has noted that it will not second guess strategies employed during voir dire. *State v. Coleman, supra* at 133. The trial court properly overruled this claim without a hearing.

*State v. Coleman*, 2002 Ohio 5377 at ¶¶ 10-12 (2nd Dist. Ohio 2002).

Wilkerson's response indicated that he was related to, or was a close friend of, the county prosecutor or one of his staff members. *Id*. at PageID 1942, *citing* Return of Writ, Doc. No. 167, Apx. Vol. 7 at 139. Coleman argues that counsel had a duty to further inquire into this response to determine if this relationship would have prevented or impaired Wilkerson from performing his duties as an impartial juror. The record shows that at the beginning of this juror's voir dire, counsel did not have a copy of the questionnaire. (Trial Tr. Vol. 2 at 69.) The court supplied counsel with copies. *Id*. at 72-73. Still, despite the delay in reviewing the questionnaire, this may have been trial strategy, as Wilkerson was one of the remaining African-Americans on the venire panel. In addition, Wilkerson responded affirmatively that he could follow the law as given by the judge and that he could be a fair juror to both the defendant and the State of Ohio. (Trial Tr. Vol. 4 at 553, 563.) Counsel were not ineffective in regard to the questioning of this juror and the state courts did not unreasonably apply *Strickland* in deciding so.

Next, Petitioner challenges the effectiveness of his counsel based on their voir dire of venire member Gibson. (Traverse, Doc. No. 170, PageID 1942.)  He argues that this potential juror stated multiple times that she would only consider a life sentence if there was no chance that Coleman would ever be released. *Id.*  At the time of his trial, life without parole was not an option, and therefore, this juror would not have been able to follow the law as given by the court. *Id.*  The trial judge questioned Ms. Gibson and during this exchange, the court explained the three possible options and clarified that Petitioner would in fact have to serve either twenty or thirty years before even being considered for the possibility of parole. (Trial Tr. Vol. 3 at 462-463.)  Gibson indicated that, after the clarification, she understood and would be willing to consider all penalties, depending on the findings as to the facts in the case. *Id.* at 463.  As this potential juror was rehabilitated and indicated that she could follow the law as given, Petitioner cannot establish that he was prejudiced from counsel's failure to further question Ms. Gibson. Additionally, this Court notes that Gibson did not serve on the jury in this case.

Next, Petitioner argues counsel were ineffective during voir dire in their misstatement to potential jurors as to the purpose of the mitigation phase. (Traverse, Doc. No. 170, PageID 1942.)  Specifically, he cites to the following examples:

> "And the second trial is the - - to determine the penalty after weighing what the prosecutor's telling you, weighing the goods and the bads and arriving at the penalty."

(Trial Tr. Vol. 3 at 273.)

> "Okay.  Now, the second phase of the trial, that phase of the trial is when you hear the evidence on the part of the defendant that's supposed to excuse him, not - -not find him not guilty, but just make the sentence less severe.  Then you'll hear evidence from the prosecution that asks you to make it more severe"

(Trial Tr. Vol. 3 at 315-316.)

> "Now, assuming those same facts - -and, then, of course, you're given information from the defense that should take the sting out of it, and you're given information from the State's side that puts the sting back in it."

(Trial Tr. Vol. 3 at 372.)

> "Now, would that apply to the second phase of the trial where you hear the aggravation, mitigation, some good and some bad[.]"

(Trial Tr. Vol. 3 at 381.)

> "Second phase is what are we going to do to him because he did it? And then that's the phase where they bring in - - the State will introduce some facts that make it look a little worse.  The other side would introduce what makes it look a little lighter."

(Trial Tr. Vol. 3 at 399.)

> "And if it satisfied you that you should give him a break, you would do that?"

(Trial Tr. Vol. 3 at 459.)

The potential jurors were told that the court would instruct them on the law. (Trial Tr. Vol. 4 at 528.)  Jurors are presumed to follow the instructions as given by the court. *Richardson v. Marsh*, 481 U.S. 200, 211 (1987); *Washington v. Hofbauer*, 228 F.3d 689, 706 (6th Cir. 2000). Also, in the majority of the instances cited by Petitioner, the potential juror was not selected to serve on the jury, so therefore was not prejudiced by the alleged misstatement. (Trial Tr. Vol. 3 at 273) (this person knew the victim and was excused); (Trial Tr. Vol. 3 at 315-316) (was excused as she was in high school and had classes); (Trial Tr. Vol. 3 at 361) (this person was excused for views on death penalty); (Trial Tr. Vol. 3 at 372) (this person did not serve); (Trial

74

Tr. Vol. 3 at 381) (was a security guard at London Orient, was excused); (Trial Tr. Vol. 3 at 399) (did not serve); (Trial Tr. Vol. 3 at 459) (did not serve).[1]

Next, Petitioner argues counsel's ineffectiveness in their failure to properly argue the standard of proof. (Petition, Doc. No. 9, PageID 20); (Traverse, Doc. No. 170, PageID 1943-1944.)  He specifically cites to the following example, "[b]ut now the reverse, if we show evidence beyond a reasonable doubt that he's not guilty, would you have any hesitation at all of signing the verdict if it's not guilty?" (Trial Tr. Vol. 3 at 416.)  This is clearly not a correct statement of any burden of proof on a defendant.  The jurors, however, were instructed by the trial judge that the court was the authority on the law as to be applied in this case. (Trial Tr. Vol. 4 at 528.)  During voir dire, the judge instructed that the State of Ohio has the burden of proof on every element of the offense and that the defendant carries no burden of proof and is presumed innocent. (Trial Tr. Vol. 4 at 525.)  Jurors are presumed to follow instructions as given to them by the court. *Richardson v. Marsh*, 481 U.S. 200, 211 (1987); *Washington v. Hofbauer*, 228 F.3d 689, 706 (6th Cir. 2000).

Petitioner has not been able to show ineffective assistance of counsel in the guilt phase under *Strickland*.  The decision by the state courts was neither contrary to nor an unreasonable application of Supreme Court law.  This ground for relief is without merit and should be denied on the merits.  Because reasonable jurists would not disagree with this conclusion, Coleman should also be denied a certificate of appealability on this Ground for Relief.

---

[1] The jurors in this case were Carolyn Weber, David Fout, James Kuntz, Cynthia White, Joycelyn Kastle, Diana Miller, Dave Carpenter, Michael Combs, Jesse Wilkerson, Stephen Griffith, Elizabeth Callison, Jessica Williams.

**Fourth Ground for Relief:  Ineffective Assistance in Mitigation**

In his Fourth Ground for Relief, Coleman asserts he received ineffective assistance of trial counsel in the mitigation phase of his trial in that his counsel, he asserts, failed to fully investigate and present available mitigating evidence (Petition, Doc. No. 9, PageID 21; Traverse, Doc. No. 170, PageID 1961, 1964).  He alleges that they waited to hire an investigator until trial had commenced, leaving insufficient time to interview witnesses, to perform a proper investigation, and to request and review records relating to Coleman's personal history. (Traverse, Doc. No. 170, PageID 1961-1964.)

As with the Third Ground for Relief, Respondent argues it is not properly pled, but the Magistrate Judge finds the Petition satisfies Rule 2(c) of the Rules Governing § 2254 Cases.

Coleman raised this claim on direct appeal where the Ohio Supreme Court held:

> **E. Failure to Object to Trial-Phase Evidence**
>
> Coleman complains that his counsel failed to object to the state's introduction of the trial-phase exhibits at the penalty hearing. However, counsel did not perform deficiently by failing to object. Almost all the trial-phase evidence was ultimately admissible in the sentencing phase, since it related to the nature and circumstances of the offense, to Coleman's history, character and background, to the R.C. 2929.04(A)(8) aggravating circumstance, or to the R.C. 2929.04(B)(2) or (B)(7) mitigating factors that Coleman specifically raised.  In *State v. DePew* (1988), 38 Ohio St. 3d 275, 283, 528 N.E.2d 542, 552, we recognize that R.C. 2929.03(D)(1) permits "repetition of much or all that occurred during the guilt stage," by way of introduction of trial exhibits that are relevant to the aggravated circumstances the offender was found guilty of committing.  Accord *State v. Woodard* (1993), 68 Ohio St. 3d 70, 78, 623 N.E.2d 75, 81.  In this case, evidence of Coleman's drug sales to Stevens, including the crack cocaine, tape recordings, and officer testimony, related directly to the R.C. 2929.04(A)(8) aggravating circumstance.

Appellant argues that evidence of Coleman's 1994 drug-trafficking conviction was not relevant in the penalty phase, since its admissibility was based upon the weapons under disability charge. However, this evidence was harmless. See *Woodard*, 68 Ohio St. 3d 80, 623 N.E.2d at 82-83 (Sherck, J., concurring). A myriad of other evidence at trial demonstrated that Coleman was a drug dealer, and the indictment for the sales to Stevens, which was directly relevant to the aggravating circumstance, also referred to the 1994 drug trafficking conviction. Thus, appellant has failed to establish either deficient performance or prejudice.

## F. Failure to Present Additional Mitigation Evidence

Coleman argues that his counsel failed to investigate his background or present available mitigation evidence. However, "failure to present mitigating evidence * * * does not in itself constitute proof of ineffective assistance[.]" *State v. Hamblin* (1988), 37 Ohio St. 3d 153, 157, 524 N.E. 2d 476, 480. Accord *Burger v. Kemp* (1987), 483 U.S. 776, 107 S. Ct. 3114, 97 L. Ed. 2d 638; *State v. Keith* (1997), 79 Ohio St. 3d 514, 684 N.E.2d 47.

The record does not support Coleman's speculation that further investigation would have produced significant mitigating evidence. For example, Coleman argues that he had children, a potential mitigating factor. However, Coleman may or may not have taken care of or supported his children and, without such evidence, the fact that he fathered several children is hardly mitigating. Coleman argues that his friends cared about him, but the record suggests that his friends were drug dealers or users. Such evidence is not mitigating. Nor do we know that other family members had useful mitigating evidence to offer, and his father's testimony does not support that claim. Nor does it appear that Coleman was gainfully employed in a lawful occupation. Finally, counsel deliberately chose not to call the examining psychologist or have Coleman testify or make a statement. Examining the record, the lack of mitigation evidence does not indicate that counsel were ineffective. "'It may be * * * that counsel conducted a diligent investigation, but [were] unable to find [more] substantial mitigation evidence.'" *State v. Otte* (1996), 74 Ohio St. 3d 555, 566, 660 N.E. 2d 711, 722. Such would seem to apply in appellant's case.

In summation, the record does not support Coleman's claim that his counsel failed to adequately investigate or present available mitigation. Coleman has not shown prejudice. "To do so would

require * * * a reasonable probability that the evidence would have
swayed the jury to impose a life sentence." *State v. Keith*, 79 Ohio
St. 3d at 536, 684 N.E. 2d at 67.  Thus, Coleman's first proposition
of law claiming ineffectiveness of counsel lacks merit.

*State v. Coleman*, 85 Ohio St. 3d 129 137-139 (1999).

Petitioner again raised this claim, with additional documentary support, in his first post-

conviction relief proceeding.  The court of appeals held:

> In his tenth claim, Coleman argues his counsel were ineffective in
> not conducting an adequate investigation into Coleman's
> background for mitigating evidence.
>
> In support of this claim, Coleman submitted the affidavit of Dana
> Strodes. (Def. Ex. 19).  In her affidavit she said that had the
> Doughtys talked to her, she would have been willing to testify that
> Coleman loved and cared for his son and that he was never violent
> towards her.  She would also have said he was a good father.
> Coleman argued that Athea Martin and Susan Smith, both who had
> a child by Coleman, would have provided similar testimony.
> Coleman argued that the testimony if offered in the mitigating
> phase of the trial was crucial given the fact there was residual
> doubt whether he committed the crime.
>
> In opposition, the State presented the affidavit of Detective Jeffrey
> Flores who stated that Dana Strodes told him that Coleman shot
> her in 1992.
>
> In overruling the tenth claim, the trial court found that the record
> did not support Coleman's claim that further investigation by
> counsel would have produced any more mitigating evidence than
> the testimony of Coleman's father.
>
> In *State v. McGuire* (1997), 80 Ohio St.3d 390, 686 N.E.2d 1112,
> the Supreme Court held that residual doubt is no longer a
> mitigating factor.  In any event, the court held the overwhelming
> evidence of Coleman's guilt precluded the presence of residual
> doubt.  The court also held that the trial record did not support
> Coleman's speculation that further investigation would have
> produced significant mitigating evidence.  The court noted the fact
> that Coleman fathered several children from different women
> without marrying them was hardly mitigating.  The court noted
> that the "failure to present mitigating evidence . . . does not in itself
> constitute proof of ineffective assistance." *State v. Coleman*, 85

Ohio St. 3d 129, 138, 707 N.E. 2d 476, citing its previous case of *State v. Hamblin* (1988), 37 Ohio St, 3d 129, 138, 707 N.E.2d 476. In this case trial counsel may not have wished to diminish the poignant testimony of Coleman's father with testimony of the women who Coleman had impregnated but never married. Finally, to show prejudice from counsel's failure to present mitigating evidence there must be a reasonable probability that the evidence would have swayed the jury to impose a life sentence. *State v. Keith* (1997), 79 Ohio St. 3d 514, 684 N.E.2d 47. Assuming Dana Strodes, Athea Martin, and Susan Smith all testified that Coleman was a good father and was never violent toward them, it is highly improbable the jury would have been swayed to impose a life sentence in light of the jury's finding that Coleman had virtually executed Melinda Stevens in retaliation for her informant activities. The tenth claim was properly rejected by the trial court.

In his eleventh claim, Coleman contends his counsel were ineffective in the mitigation phase by not calling his mother and sister to testify in his behalf. In support of this claim Coleman presented affidavits of Sonja Coleman, his sister, and Eula Coleman, his mother.

In her affidavit, Sonja Coleman said her brother's behavior began to worsen around his eighteenth birthday and he moved out of their family home on several occasions. She said her brother was working at the time of his arrest for the murder and appeared to be financially supporting his children. She said she was never contacted by her brother's attorneys. Eula Coleman said her son was a happy and friendly child. She said her son had difficulty in school because of a learning disability. She said her son became rebellious when he was 17 or 18 years of age. She said she met with Jon Doughty at his office to speak with Dr. Erhard Eimer, a psychologist. She said she did not meet with the Doughtys prior to trial to discuss her son's case.

The trial court overruled this claim noting that the record at trial established that Eula Coleman could not testify at the mitigation hearing because she was too upset. The court noted that Sonja's testimony was merely cumulative to that of her father's and there was no likelihood that the outcome of the sentencing hearing would have been different if counsel had presented her testimony. We agree with the trial court's resolution of this claim as well. Counsel can hardly be faulted for not calling Eula Coleman to the stand after the indicated she was too upset to testify. The following occurred at the trial:

"Q:     Now, Mrs. Coleman is here?

"A:     Yes, she is.

"Q:     Your wife, is that true?

"A:     Yes.

"Q:     And she's sitting out in the hall, but I understand she doesn't want to testify. Would you tell the jury why.

"A:     My wife - -Timothy and his mother, are very, very close. And being a mother, a caring mother, she have taken this - - this situation very seriously and have upset her.  I would probably say her blood pressure is a little high at the moment.  She's having a hard time sleeping.  She's having a hard time trying to cope with this.

"Never - -she's never would have imagine that he would have - - anything like this would have ever happened, you know.  So that's why she don't want to testify, in fear that she may lose control or break down or, you know, or upset Tim or, you know, whatever.

"Mr: James Doughty: Thank you. Do you have any questions?

"Mr. Schumaker:     State would have no questions for Mr. Coleman, Your Honor.

"The Court:     Thank you, Mr. Coleman."

The trial court properly overruled Coleman's eleventh claim without providing him an evidentiary hearing.

In his twelfth claim, Coleman argues that his trial counsel were ineffective in not presenting the testimony of Dr. Earhard Eimer, a clinical psychologist during the mitigation phase of the trial.  In his affidavit, Dr. Eimer stated he was retained in January 1997 by the Doughtys to evaluate Tim Coleman.  Dr. Eimer said he interviewed Coleman on four separate occasions for a total of some 8.25 hours.  Dr. Eimer said he conducted three clinical tests and determined that Coleman had a Compulsive Personality Disorder. Dr. Eimer said Coleman obtained remarkably low scores for personality disorders that would be typical of persons likely to engage in violent crimes against persons.  He said that the diagnostic indications emerging from Coleman's tests counter-

indicate any other personality disorder, particularly those associated with a tendency to engage in violent crimes.

Further Dr. Eimer said there were three factors which speak against the notion that Tim Coleman might have engaged in a violent crime: (1) his upbringing in a morally well-integrated family, (2) no indication of impulsiveness or aggressiveness on Coleman's part even when acutely challenged, and (3) tendencies to worry and be fearful and not to be manipulative consistent with a personality that is not of a violent nature.

The State argues that it was professionally reasonable for the Doughtys not to have put Dr. Eimer on the stand in the mitigation phase of trial because his opinion was not admissible and in any event would have alienated the jury given the doctor's opinion that Coleman's personality was inconsistent with violent conduct. Also the State argued that Eimer's findings that Coleman typically does not assume responsibility for his problems and tends to blame others were consistent with Coleman blaming Melinda Stevens for his problems with the law which was the motive for the killing.

The trial court overruled this claim adopting the State's position in every respect and we agree with the trial court's disposition of this claim as well. In light of Dr. Eimer's views that Coleman typically blames others for his conduct, it is doubtful Dr. Eimer's testimony would have been helpful. In any event, trial counsel must be accorded substantial deference in making these judgments even in death penalty cases. There also seems little likelihood Dr. Eimer's testimony would have provided substantial mitigation to the crime committed by Coleman. The trial court properly overruled Coleman's twelfth claim.

In his thirteenth claim, Coleman contended the Doughtys were ineffective in not having Deputy Steven Williams testify in the mitigation hearing. Williams stated in his affidavit that he transported Coleman to and from jail during the capital trial and "at no time during the six day trial, did I observe Mr. Coleman misbehave or present any kind of resistance while under my supervision." (Ex. 25). In support of his claim Coleman refers us to the United States Supreme Court case of *Skipper v. South Carolina* (1986), 476 U.S. 1, 90 L.Ed. 2d 1, 106 S. Ct. 1669, wherein the court held that it was error to exclude evidence in the sentencing hearing of two jailers and a "regular" visitor that the defendant had made a "good adjustment" during the 7 ½ months he had spent in jail between arrest and trial. Justice White wrote the following on behalf of the court:

Finally, the State seems to suggest that exclusion of the proffered testimony was proper because the testimony was merely cumulative of the testimony of petitioner and his former wife that petitioner's behavior in jail waiting trial was satisfactory, and of petitioner's testimony that, if sentenced to prison rather than to death, he would attempt to use his time productively and would not cause trouble. We think, however, that characterizing the excluded evidence as cumulative and its exclusion as harmless is implausible on the facts before us. The evidence petitioner was allowed to present on the issue of his conduct in jail was the sort of evidence that a jury naturally would tend to discount as self-serving. The testimony of more disinterested witnesses - -and, in particular, of jailers who would have had no particular reason to be favorably predisposed toward one of their charges - - would quite naturally be given much greater weight by the jury. Nor can we confidently conclude that credible evidence that petitioner was a good prisoner would have had no effect upon the jury deliberations. The prosecutor himself, in closing argument, made much of the dangers petitioner would pose if sentenced to prison, and went so far as to assert that petitioner could be expected to rape other inmates. Under these circumstances, it appears reasonably likely that the exclusion of evidence bearing upon petitioner's behavior in jail (and hence, upon his likely future behavior in prison) may have affected the jury's decision to impose the death sentence. Thus, under any standard, the exclusion of the evidence was sufficiently prejudicial to constitute reversible error. (Emphasis added).

In this case the prosecutor gave a very brief argument in support of the death penalty. The prosecutor argued the specification of the aggravated murder of a witness outweighed any mitigating evidence presented by the defendant. We agree with the State's position that even if counsel had presented the testimony of Deputy Williams, there is no reasonable probability that the jury's sentence would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2025, 80 L. Ed. 2d 674. The trial court properly overruled Coleman's thirteenth claim.

In his fourteenth claim, Coleman contends the Doughtys were ineffective in not presenting a cultural expert who could have helped the jury understand why he turned to a life of drug dealing

despite the fact that he had a stable family life. In overruling this claim, the trial court stated that such testimony would not mitigate the fact that Coleman executed the mother of five children and in any event, even if mitigating, would not have overcome the aggravated circumstances presented by the State. We agree that such testimony would not present a reasonable probability of a different sentence than that imposed by the jury. The trial court properly overruled the fourteenth claim without an evidentiary hearing.

In his fifteenth claim, Coleman contends the Doughtys were ineffective in the sentencing phase of the trial by not presenting the mitigating testimony of his mother, his sister, his girlfriends, a deputy sheriff, and the psychologist who evaluated him. He also argues his counsel were ineffective in not introducing employment records that he was gainfully employed at Fox Lite, Inc. days before the crime occurred. Also he argues counsel gave a woefully weak closing argument in the mitigation phase of trial.

In support of this claim, Coleman submitted Exhibit 33 which were Fox-Lite employment records indicating that Coleman worked as an assembler from November 12, 1995 until February 5, 1996 when he was laid off for lack of work. The trial court overruled this claim again finding nothing in the claim that suggested a reasonable possibility that the sentence imposed upon Coleman would have been different had this mitigation evidence been presented.

The Doughtys could hardly be faulted for failing to call Mrs. Coleman to the stand when the record disclosed she was too distraught to testify. The claim that counsel's final argument was weak was a claim properly asserted in the direct appeal not in a post-conviction proceedings. The only additional argument raised herein was counsel's failure to introduce Coleman's employment records which indicate he was working for three months prior to the homicide. The trial court properly denied this claim without an evidentiary hearing because there is no reasonable probability that the jury would have found this additional mitigating evidence would have outweighed the aggravated circumstance.

In his sixteenth claim, Coleman contended that the cumulative impact of the litany of counsel's errors rendered Coleman's capital proceedings unconstitutional. Coleman noted that his counsel failed to form a meaningful relationship with him, failed to properly investigate his innocence claims, failed to properly prepare to cross-examine the State's witnesses, failed to adequately

83

conduct voir dire, failed to properly obtain grand jury transcripts, failed to properly present mitigating evidence, and failed to present a cogent closing argument in his behalf.

The State argued below and in this court that since none of the claims had individual merit, they can have no strength in the aggregate. The trial court found that State's argument persuasive and we do also. The trial court found many of Coleman's claims to be based on incredible testimony and applied the Calhoun case to its disposition of the claim. Other claims challenged tactical decisions by counsel and other claims, even if accepted as true, did not suggest a probability that the outcome of Coleman's trial would be different had counsel acted as Coleman claimed they should have. The trial court properly overruled Coleman's sixteenth claim as well.

*State v. Coleman*, 2002 Ohio 5377 at ¶¶ 40-71 (2nd Dist. Ohio 2002).

This Ground for Relief, like the Third, is governed by S*trickland v. Washington*, *supra*. In evaluating whether or not the representation of counsel was ineffective, it must be evaluated for "reasonableness under prevailing professional norms." *Id*. When analyzing an ineffectiveness claim for failure to investigate, the court must consider the claim by assessing the reasonableness of the decision and by giving heavy deference to counsel's judgment. *Id*. at 691; *but see Glenn v. Tate*, 71 F.3d 1204, 1207 (6th Cir. 1995); *see also Austin v. Bell*, 126 F.3d 843, 848 (6th Cir. 1997); *see further Skaggs v. Parker*, 235 F.3d 261, 269, 271 (6th Cir. 2000). There is a constitutional duty on the part of counsel to investigate, as effective assistance requires making professional decisions and informed legal choices, which can only be rendered after investigation. *Strickland*, 466 U.S. at 680; *Carter v. Bell*, 218 F.3d 581, 596 (6th Cir. 2000) (Counsel must make some effort at independent investigation in order to make a reasoned, informed decision as to [the utility of mitigating factors offered by defendant]".)

Furthermore, as established in *Strickland* and reiterated in *Wiggins*, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable

professional judgments support the limitations on investigation." *Strickland v. Washington*, 466 U.S. 668, 690-691; *Wiggins v. Smith*, 539 U.S. 510, 528 (2003). The investigation does not need to be exhaustive, but must be reasonably substantial in examining the facts, circumstances, pleadings and the laws involved. *Strickland*, 466 U.S. at 680.

The American Bar Association has adopted Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989 and 2003). The Supreme Court of the United States has held that these guidelines "provide the guiding rules and standards to be used in defining the 'prevailing professional norms.'" *Wiggins v. Smith*, 539 U.S. 510 (2003) (reinforcing rulings in *Glenn v. Tate*, 71 F.3d 1204, 1206-08 (6th Cir. 1995)); *Austin v. Bell*, 126 F.3d 843, 847-48 (6th Cir. 1997); *Coleman v. Mitchell*, 268 F.3d 417, 449-52 (6th Cir. 2001)).

The Guidelines provide that:

> Investigations into mitigating evidence "should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1 (C), p 93 (1989) . . . .
> .
> [T]hat among the topics counsel should consider presenting are medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences. ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.8.6, p 133

*Wiggins*, 539 U.S. 510 (2003)(Emphasis in original). However, the 1989 and 2003 ABA Guidelines are not "inexorable commands"; rather, they are "only guides for what reasonableness means, not its definition." *Post v. Bradshaw*, 621 F.3d 406; (6th Cir. 2010), *quoting Bobby v. Van Hook*, 558 U.S. 4, 130 S. Ct. 13, 17 (2009).

In its decision to impose the death penalty, the trial court wrote:

> Although the defendant did not testify in either the first or second phase of this trial the testimony of the State's witnesses was that the defendant had stated that he couldn't afford to do the prison time that he faced from his pending Aggravated Trafficking charges. The defense argued in the mitigation phase of the case that the defendant was thus under a great deal of stress at the time of this offense from the prospect of going back to prison.
>
> However, the defendant offered no evidence that it would be unlikely that this offense would have been committed but for this "duress." Two of the State's witnesses testified that after the killing the defendant appeared to be nervous, but one of these witnesses testified that the defendant did not appear nervous before the killing took place. In addition, the testimony at trial indicated that after the shooting the defendant went looking for a police scanner, disposed of a shirt-jacket and shoes that he was wearing and bragged about "taking care of his business", even demonstrating to one witness how the victim fell after he shot her. The defendant has a history of criminal misconduct. To logically adopt the defendant's reasoning to this mitigating factor would require this Court to condone a criminal act each time the defendant were placed in a stressful situation. The Court therefore finds that the evidence does not support this mitigating factor.
>
> The Court also considered any other factors to the issue of whether or not the offender should be sentenced to death. The father of the defendant, Willie Coleman, testified in mitigation. Mr. Coleman testified that the defendant was "like any other kid" growing up. The defendant was involved in Boy Scouts and school functions and activities as a youth. He was also active in sports, most notably football. The defendant was described as a very obedient child that "would give you his heart." The defendant's father also stated that Timothy Coleman was never a violent man. Willie Coleman stated that his wife, the defendant's mother, was present in the hallway outside of the courtroom but that she was too emotional to testify.
>
> It was apparent to the Court that the defendant's father loved his son and that the defendant's background did not contribute to his becoming a violent criminal. It was the defendant's decision to set his own standard of acceptable behavior. The Court therefore finds that these factors should be given minimal weight.

> This Court recognizes that the death penalty is the most severe penalty that can be imposed by man against man and that is should only be imposed after a most careful and meticulous review of the facts and law has taken place.  The Court believes that such an evaluation of the facts and the law in this case has been undertaken by the Court in reaching its decision.  The Court has searched for any other factors which might have been overlooked by the jury and can find none.
>
> After carefully reviewing all of the mitigating factors set forth in the statute or called to the Court's attention by the defendant and after considering the aggravating circumstance which has been proven beyond a reasonable doubt, it is the opinion of the Court that the Aggravating Circumstance outweighs all the mitigating factors beyond a reasonable doubt as required by Ohio Revised Code Section 2929.03(D)(3).

(Opinion, Return of Writ, Doc. No. 167, Apx. Vol. 2 at 160-162.)

Petitioner argues that because of his counsel's failure to investigate, and the abbreviated nature of what little investigation they did perform, they failed to fully present Petitioner's background, character, and development. (Petition, Doc. No. 9 at 21); (Traverse, Doc. No. 170, PageID 1961.)  He further states that the failure to interview people who could have provided mitigation evidence, such as his family members, was in direct opposition to the standards for mitigation set forth by United States Supreme Court law, the Sixth Circuit Court of Appeals, and the American Bar Association recommendations. (Traverse, Doc. No. 170, PageID 1965); *citing Williams v. Taylor*, 529 U.S. 362, 373 (2000); *Johnson v. Bagley*, 544 F.3d 592, 600 (6th Cir. 2008); *Mason v. Mitchell*, 543 F.3d 766, 780 (6th Cir. 2008); A.B.A. Guidelines § 11.4.1 (D)(3)(B).  This allegedly resulted in grossly inadequate mitigation evidence. (Traverse, Doc. No. 170, PageID 1965.)  Specifically, had counsel been effective they would have uncovered and been able to present the following mitigation evidence:

> A)    Petitioner's history as a caring father to his five children.
> Dana Strodes, Athea Martin, and Susan Smith, the three

mothers of Petitioner's children, would have been willing to testify that Petitioner was a responsible loving father. (P.C. Exs. 19, 23, 24).

B)      Evidence of Petitioner's non-violent nature. (P.C. Exs. 19, 23, 24, 26, 40, 43).

C)      Evidence from Petitioner's sister, Sonya Coleman, who would have testified that Petitioner was a loving brother, and a responsible loving father. (P.C. Ex. 21).

D)      Evidence from Deputy Steven Williams of the Clark County Jail, who observed Petitioner's good behavior while incarcerated. (P.C. Ex. 25).

E)      Evidence from a cultural expert, which would have helped the jury understand why Petitioner turned to a life of drug dealing, despite the fact that he had a stable family life, due to the myriad of problems and unique cultural pressures facing young black males in urban environments. (P.C. Exs. 20, 22).

F)      Evidence of Petitioner's gainful employment at Fox Lite, Inc., which would have supported testimony that Petitioner was a good worker and was making an attempt to lead a crime-free life. (P.C. Ex. 35).

(Petition, Doc. No. 9 at 16.)

In addition the following evidence was uncovered during post-conviction investigations:

A) Inmate John Stojetz, a client of trial counsel at the time of Petitioner's trial, reported he was told by Jon Doughty that Petitioner did not have "good mitigation." Doughty reportedly told Stojetz that no mitigation was prepared for Petitioner, because there was no need for mitigation since "Petitioner had shot a girl with five kids." Doughty had also previously referred to Petitioner as "a typical stupid nigger." (P.C. Ex. 14).

B) Petitioner's father, Willie Coleman, revealed that counsel did not adequately prepare him for testifying at the mitigation phase. Counsel prepared Willie Coleman to testify by telling him that, "there wouldn't be any questions, just a brief background on Tim." (P.C. Ex. 20).

C) Petitioner's sister, Sonya Coleman, revealed that defense counsel never contacted her, or asked her to testify at the mitigation phase. (P.C. Ex. 21).

D) Trial counsel hired the services of Dr. Earhard Eimer, PhD., but did not present his testimony at Petitioner's trial.  In his post-conviction affidavit, Dr. Eimer indicated he was willing to testify that, in his professional opinion and given Petitioner's psychological profile, Petitioner lacked the psychological propensity to commit the charged capital crime. (P.C. Ex. 40). Dr. Franklin Hurt, Jr. PhD. conducted psychological testing on Petitioner for purposes of post-conviction, and reached the same conclusion as Dr. Eimer, despite the fact that he performed his evaluation over a year after Dr. Eimer's evaluation. (P.C. Exs. 26, 43.)

(Petition, Doc. No. 9 at 17.)

In the course of preparing for mitigation, counsel met briefly with Petitioner's father, Willie Coleman. (Traverse, Doc. No. 170, PageID 1965.)  He was the only witness called during the mitigation phase to testify on Petitioner's behalf. *Id*.  The testimony given by Mr. Coleman was both general in nature and very concise, comprising only six pages of transcript. *Id*.  An affidavit from Mr. Coleman, presented during post-conviction relief proceedings, stated that he had had very limited interaction with defense counsel and was not given any preparation as to what he would be asked to testify to during the mitigation phase. He further stated he was not made aware of what type of evidence may have been relevant to the mitigation portion of the trial, but rather, was only told it would be a brief background on his son. (Return of Writ, Doc. No. 167, Apx Vol. 7 at 166, Aff. of Willie Coleman ¶ 21-22.)  Additional affidavits from various friends and family members show that they would have been willing to testify had they been asked to do so, but that they were never contacted by defense counsel. (Traverse, Doc. No. 170, PageID 1966); (Return of Writ, Doc. No. 167, Apx. Vol. 7 at 163, Aff. of Dana Strodes  ¶ 17); (Return of Writ, Doc. No. 167, Apx. Vol. 7 at 169, Aff. of Sonya Coleman ¶¶ 9-11 ); (Return of

Writ, Doc. No. 167, Apx. Vol. 7 at 174, Aff. of Susan Smith ¶ 9); (Return of Writ, Doc. No. 167, Apx. Vol. 7 at 176, Aff. of Athea Martin ¶ 9.)  Coleman asserts that the affidavits show that additional mitigation testimony was available and could have been presented to both give the jury a better understanding of his personal history and humanize him in their eyes. (Traverse, Doc. No. 170, PageID 1967.)  This information included:

1.  That he was a loving person. (Return of Writ, Doc. No. 167, Apx. Vol.7 at 166, Aff. of Willie Coleman ¶ 5); (Return of Writ, Doc. No. 167, Apx. Vol. 7 at 169, Aff. of Sonya Coleman ¶¶ 2, 8); (Return of Writ, Doc. No. 167, Apx. Vol. 7 at 171, Aff. of Eula Coleman ¶ 5.)

2.  That he suffered from a learning disability/dyslexia. (Return of Writ, Doc. No. 167, Apx. Vol. 7 at 166, Aff. of Willie Coleman ¶ 6); (Return of Writ, Doc. No. 167, Apx. Vol. 7 at 171, Aff. of Eula Coleman ¶¶ 6-7.)

3.  That he was a loving and responsible father to his children. (Return of Writ, Doc. No. 167, Apx. Vol. 7 at 166, Aff. of Willie Coleman ¶¶ 13-14); (Return of Writ, Doc. No. 167, Apx. Vol. 7 at 169, Aff. of Sonya Coleman ¶ 7); (Return of Writ, Doc. No. 167, Apx. Vol. 7 at 174, Aff. of Susan Smith ¶¶ 3-4); (Return of Writ, Doc. No. 167, Apx. Vol. 7 at 176, Aff. of Athea Martin ¶ 8.)

4.  That he was a non-violent person. (Return of Writ, Doc. No. 167, Apx. Vol. 7 at 163, Aff. of Dana Strodes ¶ 14); (Return of Writ, Doc. No. 167, Apx. Vol. 7 at 174, Aff. of Susan Smith ¶ 5); (Return of Writ, Doc. No. 167, Apx. Vol. 7 at 176, Aff. of Athea Martin ¶ 6); (Return of Writ, Doc. No. 167, Apx. Vol. 8 at 81, Aff. of Dana Strodes ¶ 2.)

For an ineffective assistance of counsel claim to succeed, counsel must have performed deficiently, and that performance must have prejudiced the defendant.  There is a constitutional duty on the part of counsel to investigate, as effective assistance requires making professional decisions and informed legal choices, which can only be rendered after investigation. *Strickland*,

90

466 U.S. at 680; *Carter v. Bell*, 218 F.3d 581, 596 (6th Cir. 2000)(Counsel must make some effort at independent investigation in order to make a reasoned, informed decision as to [the utility of mitigating factors offered by defendant]"); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (deprived of representation when counsel 'abandoned their investigation of [his] background after having acquired only rudimentary knowledge of his history from a narrow set of sources.') The investigation does not need to be exhaustive, but must be reasonably substantial in examining the facts, circumstances, pleadings and the laws involved. *Strickland*, 466 U.S. at 680. Here, counsel failed to make an adequate investigation. They met with a small number of potential witnesses, specifically Petitioner's father, however they failed to speak with other family members and close friends that would have been willing to testify on Coleman's behalf. Furthermore, counsel failed to explain the mitigation process and prepare the one witness they did present.

Additionally, counsel were deficient in their late hiring of an investigator. As a result of this delay, investigation did not begin until the day before the start of voir dire. The investigator did not have direction from counsel, but rather simply unsuccessfully attempted to interview two other possible suspects and conducted a brief interview with Gaskins who proved to be an inculpatory witness rather than exculpatory. There is no evidence that counsel or the investigator looked into Coleman's medical, educational, employment, or additional family and social history, or looked into his prior adult correctional experience, religious or cultural influences. Even in applying deference, counsel did not undertake enough investigation to make reasonable decisions. If no investigation is conducted, counsel cannot know if additional mitigation evidence would be counterproductive or fruitless. They fell below the standard of "reasonableness under prevailing professional norms."

The Court now turns to the prejudice prong of *Strickland*.  The Petitioner directs this Court to *Morales v. Mitchell*, 507 F.3d 916 (6th Cir. 2007).  In *Morales*, the court determined that counsel failed to discover and present mitigation evidence to the jury including "many specific details about his tumultuous life, continued and uncontrolled alcohol and drug abuse, dysfunctional family history, potential mental health problems, and a detailed cultural background. *Morales v. Mitchell*, 507 F.3d at 935-936.  The court of appeals concluded that had counsel performed even the most basic of investigations, they would have discovered defendant's deprived childhood; that his father was an alcoholic; his mom was neglectful; his half-sister, who was responsible for his care, had emotional issues and committed suicide; and his brother, to whom he was a protector, was mentally disabled and as a result of violent outbursts needed to be placed in a psychiatric hospital on multiple occasions. *Id.* at 931-934.  Morales' environment was unstable and as a result of this instability and feeling like a social outcast, he ended up dropping out of high school.  Additionally, counsel in the *Morales* case could have presented evidence that defendant began using drugs and alcohol at age nine at the prodding of the elders, that in the Native American community it is seen as "unmanly" not to drink, that as a result of his drinking he was often violent and suffered from blackouts, that defendant's parents, aunts, uncles, and grandparents drank, and that some of these family members had died as a result of cirrhosis.  The court held that this evidence was "significant and not cumulative of the evidence actually presented during the guilt and penalty phases." *Id.* "Because the net effect of the undiscovered and unpresented evidence, viewed cumulatively and in light of the totality of the circumstances, demonstrates the existence of significant mitigating evidence that favored Morales, it is reasonably probable that at least one juror hearing that evidence would have been persuaded to impose a life, rather than a death, sentence." *Id.* at 936.

In comparing this case, the Court finds that Petitioner is unable to show such prejudice. After a review of the mitigation phase transcript, this Court concludes that the following mitigation evidence was presented: Coleman had a good childhood and grew up in a loving family. (Trial Tr. Vol. 8 at 1291.)  He was an energetic and normal child. *Id*.  For the most part he was eager, energetic, and obedient, but occasionally he would become hardheaded and disobedient. *Id*.  His overall disposition was kind and loving, never violent. *Id*. at 1292.

The majority of the information contained within the affidavits offered during post-conviction was either cumulative (that he was a loving person) or did not rise to the level that a reasonable jurist would have found that it outweighed the aggravating circumstance.  While Petitioner may have been a responsible and loving father to his children (although one doubts a jury would have found him responsible in having five children by three different women), he was found guilty of killing a mother of five.  Likewise, testimony of a learning disorder in school would not likely have weighed strongly on the jury in balancing mitigation and the aggravating circumstances.

Additionally, Petitioner argues that counsel were ineffective in failing to present his employment records from Fox-Lite. (Traverse, Doc. No. 170, PageID 1965.)  He asserts that these records would have shown the jurors that he was a good worker, responsible, had employable skills, and was attempting to lead a crime-free life. *Id*.  While the records could have been presented, this Court does not find that they would have been persuasive.  The records reflect an employment period of three months and contain mediocre reviews, absenteeism, and tardiness.

Next he argues that counsel were ineffective in their failure to hire a cultural expert to provide testimony regarding the unique social and cultural factors that face African-American

men. (Traverse, Doc. No. 170, PageID 1969-1970.)  He argues that had this type of expert been presented, he could have provided insight to the jury as to how someone like Coleman, raised in a stable and loving family, could turn to a life of dealing drugs. *Id.*, *citing Morales*, 507 F.3d 931.  Coleman asserts that had counsel presented evidence of this kind, it is reasonably probable that at least one juror would have voted to impose a sentence of life, rather than death. *Id.* at 1970.  Petitioner fails to offer any support as to what this expert may have testified to, other than a reference of "the problems and pressures facing young African-American males in urban environments and the role that drugs play in their lives." *Id.*  Even assuming an expert on this matter had been presented, this presumes that the cultural expert's testimony would have been deemed reliable after undergoing a *Daubert* analysis and that the testimony would have been relevant to Coleman's case. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  Coleman has failed to show  counsel was ineffective.  "The decision of what mitigating evidence to present during the penalty phase of a capital case is generally a matter of trial strategy." *Hill v. Mitchell*, 400 F.3d 308, 331 (6th Cir. 2005).  "[T]he existence of alternative or additional mitigation theories generally does not establish ineffective assistance of counsel." *Phillips v. Bradshaw*, 607 F.3d 199, 207 (6th Cir. 2010).  Attorneys are not expected to present every potential mitigation theory. *Fears v. Bagley*, 462 Fed. Appx. 565, 576 (6th Cir. 2012).  It is speculative that testimony from a cultural expert would have resulted in a life sentence, rather than a sentence of death.  Petitioner does not show that there was a reasonable probability that, but for the absence of a cultural expert, the jury would have reached a different conclusion.

Next, Petitioner asserts that his counsel were ineffective in failing to call a psychologist to testify on his behalf. (Traverse, Doc . No. 170, PageID 1970.)  Prior to the mitigation phase, counsel hired an expert psychologist, Dr. Erhard Eimer,  but then decided not to call him to

testify. *Id*. Had Dr. Eimer testified, he would have stated that in his professional opinion, given Coleman's psychological profile, it was highly unlikely Coleman committed the crime for which he was convicted. *Id*., *citing* Return of Writ, Doc. No. 167, Apx Vol. 8 at 71. While Dr. Eimer's report does state that he believed that Coleman was incapable of such crime and noted characteristics such as "eager to please," shy, insecure, fear, confusion, and anxious conformity to expectations of others, other aspects of the report would have been detrimental to the defense. For instance the report begins in that it "suggests a chronic psychological maladjustment. He is overly sensitive to criticism. He is highly suspicious of other people and constantly on guard to prevent being taken advantage of. This touchiness often makes him argumentative." (Return of Writ, Doc. No. 167, Apx. 8 at 68.) In addition, it labels Coleman as being suspicious, rigid, moralistic, has a lack of trust, and an inability to compromise and negotiate making it impossible for him to develop a close relationship. *Id*. It also specifically states that "[w]hen he[Coleman] feels threatened, he may react with self-righteous indignation and complain that he has been wronged. He typically does not assume responsibility for his problems and tends to blame others or to rationalize his faults." *Id*. This line falls squarely into the State's theory of motive, that Coleman murdered Stevens in an attempt to prevent her from testifying at his drug trafficking trial, as she "snitched" on him, and he could not do that much time.

Next, Petitioner argues that his counsel were ineffective in their failure to object to the reintroduction of all the trial phase testimony at the mitigation phase. (Traverse, Doc. No. 170, PageID 1971.) This permitted the introduction of all evidence and testimony from the guilt phase to be reintroduced during the guilt phase for the jury's consideration, including unrelated and prejudicial evidence, such as the drug buy tapes, testimony from the officers regarding the drug deals, and information relating to Coleman's drug trafficking case. (Traverse, Doc. No. 170,

PageID 1971.)  Petitioner argues that it was essential for counsel to review the exhibits and testimony and lodge objections where appropriate.  *Id*.  If counsel had objected and prevented the admission of prejudicial information, he argues, then the jury may have been swayed to give life instead. *Id*. Instead, this evidence served merely to inflame the jurors passions and put their focus on the underlying crimes rather than the aggravating circumstance itself. *Id*. at 1972.

"[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  As a result, "errors in application of state law, especially with regard to the admissibility of evidence, are usually not cognizable in federal habeas corpus." *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983); *see Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001).  Otherwise stated, a state court's violation of its own evidentiary law does not, *ipso facto*, provide a basis upon which a federal court may grant habeas relief. *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  The Northern District of Ohio addressed a similar issue in *Cowans v. Bagley,* holding:

> In light of the foregoing, trial courts have considerable discretion in determining what evidence is relevant to the penalty phase and reviewing courts are loath to interfere with the exercise of that discretion. Cf., *State v. Hancock*, 108 Ohio St. 3d 57, 76, 2006 Ohio 160, 840 N.E.2d 1032 (2006) (noting that trial judges are "clothed with a broad discretion" in determining the relevancy of trial phase evidence to the penalty phase); see also *State v. Jackson*, 107 Ohio St. 3d 53, 71-72, 836 N.E.2d 1173, 2005 Ohio 5981 (2005) (finding no error in readmission of guilt phase testimony from surviving victims because testimony was relevant to course-of-conduct aggravating circumstance); *State v. Ahmed*, 103 Ohio St. 3d 27, 43, 2004 Ohio 4190, 813 N.E.2d 637 (2002) (finding no error in readmission of seven crime-scene photographs because the evidence assisted in demonstrating aggravating circumstances); *State v. LaMar*, 95 Ohio St. 3d 181, 203-204, 2002 Ohio 2128, 767 N.E.2d 166 (2002) (finding no error in readmission of photographs or demonstrative exhibits demonstrating the weapons used because evidence "bore some relevance to" the nature and circumstances of the course-of-conduct aggravating circumstance)*; State v. Fears*, 86 Ohio St.3d

329, 345-45, 1999 Ohio 111, 715 N.E.2d 136 (1999) (holding that even though a trial court should exclude evidence irrelevant to the penalty phase, the trial court in this case was not required to exclude the evidence of the killings, including gruesome photographs, because § 2929.03 (D)(1) requires the trial court to consider the nature and circumstances of the offense and permits repetition of much or all that occurred during the guilty stage (citing *DePew*, 38 Ohio St.3d at 282-83)).

The Ohio Supreme Court has clarified, however, that even though R.C. § 2929.03(D)(1) and (2) permit repetition of much or all of what happened during the culpability phase, trial courts are not relieved [of] their duty to determine which culpability phase evidence is relevant to sentencing issues, See *State v. Getsy*, 84 Ohio St.3d 180, 201, 1998 Ohio 533, 702 N.E.2d 866 (1998) (holding that *State v. Gumm*, 73 Ohio St. 3d 413, 1995 Ohio 24, 653 N.E.2d 253, syllabus (1994) "appears to require the trial court to determine what evidence is relevant"); see also *State v. Lindsey*, 87 Ohio St.3d 479, 484-85, 2000 Ohio 465, 721 N.E.2d 995 (2000) (holding that it was error for trial court to readmit guilt-phase evidence in toto without determining which evidence was relevant to penalty phase issues).

Although this latter line of cases appears to militate in petitioner's favor, the Court takes notice of the fact that even in *Getsy*, where the Ohio Supreme Court held that a trial court was required to determine what culpability phase evidence was relevant in the penalty phase and that the trial court in that case had admitted evidence that was not relevant, the Ohio Supreme Court nonetheless held in conclusory fashion that the admission of that irrelevant evidence had not prejudiced the outcome of the appellant's case. *Getsy*, 108 Ohio St. 3d at 201, 1998 Ohio 533, 702 N.E. 2d 866. Similarly, the Ohio Supreme Court concluded in *Lindsey* that the trial court's error in readmitting all of the culpability phase evidence without making a determination as to which evidence was relevant to the penalty phase issues did not prejudice the outcome of petitioner's sentencing hearing because evidence of bloody photographs of the victim, bloodstains in the appellant's vehicle, and bloodstains at a bar was relevant to the element of serious physical harm to the victim in the aggravated robbery death specification. *Lindsey*, 87 Ohio St. 3d at 485. See also *State v. LaMar*, 181 Ohio St. 3d at 203 (deeming harmless the trial court's readmission of the victim's walker, even though that evidence had tenuous connection, if any, to the aggravating circumstances). Thus, even assuming in the instant case that the trial court erred as a matter of state law in not determining the

relevancy of culpability phase evidence before readmitting it in the mitigation phase, it does not stand to follow, and in fact seems highly unlikely, that such error would warrant reversal under state law.

Beyond that, this Court is also aware of at least two district court cases holding that any possible error in readmitting culpability phase evidence in the penalty phase, assuming it is error, was insufficient to warrant habeas corpus relief. *Davis v. Mitchell*, 110 F. Supp. 2d 607, 626 (N.D. Ohio 2000)(finding no violation of clearly established federal law in the trial court readmitting in the penalty phase all evidence from the culpability phase), rev'd on other grounds, 318 F.3d 682 (6th Cir. 2003); *Morales v. Coyle*, 98 F. Supp. 2d 849, 885 (N.D. Ohio 2000) (holding that any possible violation of state law in admitting into evidence at the penalty phase all exhibits from the culpability phase was inefficient to warrant habeas corpus relief.)

*Cowans v. Bagley*, 624 F. Supp. 2d 709, 811-13 (S.D. Ohio 2008); *see also Hand v. Houk*, 2011 U.S. Dist. LEXIS 69001 (S.D. Ohio 2011).

In this case the trial court readmitted all of the culpability phase evidence, without objection, into evidence during the sentencing phase. The evidence included: the drug buy tapes, testimony from the officers regarding the drug deals, and information relating to Coleman's drug trafficking case. "A review of relevant Ohio law demonstrates to this Court that the categories of culpability phase evidence that prosecutors are permitted to reintroduce is broad and the discretion that trial courts have in determining what culpability phase evidence in relevant is wide." *Cowans*, 624 F. Supp. 2d at 813 (S.D. Ohio 2008). This evidence went to the nature and circumstances of the aggravating circumstance. Petitioner has not shown prejudicial error in the readmission of the guilt phase evidence and thus it is unlikely that an objection to this evidence would have been sustained. As such, counsel cannot be held to have been ineffective in their failure to object to this readmission.

Next, Petitioner argues counsel's ineffectiveness in their failure to present a cogent and appropriate closing argument at the sentencing phase. (Traverse, Doc. No. 170, PageID 1972), *citing Hall v. Washington*, 106 F.3d 742 (1997).  Counsel's closing argument failed to point to anything mitigating, however it did mention the victim and her children. *Id*. at 1973. This allegedly prompted the jury to focus on aggravating circumstances rather than mitigating factors.

This Court disagrees. In the closing argument of the penalty phase, defense counsel asked the jurors to consider mercy, "to ask you and to plead from you that if you find a way to give my client some mercy, that you do it." (Trial Tr. Vol. 8 at 1311.)  Counsel explained that the jurors should consider Coleman's state of mind during the offense and consider mercy in their sentencing:

> First thing, we accept, Jon Doughty, myself, we accept your verdict.  And the mitigation all I have to talk to you about is - - I'll read it to you, whether it is unlikely that the offense would have been committed but for the fact that the offender was under duress, coercion, or strong provocation.
>
> Now, you heard the testimony of Mr. Coleman peddling drugs to people and then the street talk was that there was a snitch on the street; and it was this tragic young lady with five children who was reporting back to the Police Department. You heard the detectives testify here.  He didn't know anything about it.  He thought she had maybe two children.
>
> * * * *
>
> Now, the - -the relevance in that is that the state of mind to the defendant was not normal.  I don't mean he was mentally ill or anything; but based on the testimony that I heard, he was almost semi hysterical at times because of the picture he was facing as a result of this trial.
>
> And that led to her death.  I don't mean to imply in any way that you should forgive him for this.  You've already given your verdict.

> And I'll read the law to you on this.  This- - what he did does not justify or excuse the offense, but because of the state of mind may in fairness and mercy be considered by you in order to reduce the degree of defendant's punishment to 30 or 20 years.

 (Trial Tr. Vol. 8 at 1312-1313.) This sub-claim is without merit.

Next, he argues counsel's ineffectiveness in failing to investigate *Skipper* evidence. (Traverse, Doc. No. 170, PageID 1974.)  *Skipper v. South Carolina* held that the sentencer should consider evidence of a defendant's good behavior and peaceful adjustment while imprisoned. 476 U.S. 1 (1986).  Steven Williams, a deputy sheriff at the Clark County Jail, would have been able to testify that while transporting Coleman back and forth from the jail to his trial proceedings, "at no time during the six-day trial, did I observe Mr. Coleman misbehave or present any kind of resistance while under my supervision." (Traverse, Doc. No. 170, PageID 1974, *citing* Return of Writ, Doc. No. 167, Apx. Vol. 7 at 178, Aff. of Steven Williams.) Petitioner argues that this testimony would have been relevant and potentially persuasive to the jury as it would have shown that if sentenced to prison he would be able to adjust peacefully.

While this evidence could have been presented, Petitioner was not prejudiced by this omission.  Deputy Williams would have testified that he observed Coleman's good behavior over a significantly short amount of time, while transferring Coleman to and from the jail for his trial. Based on these short interactions, it is unlikely that a juror would assign this mitigating factor much weight.  Testimony about Coleman's time in jail would also likely have drawn the jury's attention to his having recruited White to assist in the murder while he was in jail.

As Petitioner has not been able to meet the prejudice prong of *Strickland*, the decision by the state courts was neither contrary to nor an unreasonable application of Supreme Court law. This Fourth Ground for Relief is without merit.  However, reasonable jurists could disagree with

100

his conclusion, given that there is wide divergence among federal courts in evaluating the proper extent of mitigation investigation and what evidence seems likely to be mitigating. If the District Court does dismiss the Fourth Ground as recommended, the Magistrate Judge also recommends that a certificate of appealability be issued on this claim.


**Fifth Ground for Relief: Exclusion of a Juror on Racial Grounds**


In his Fifth Ground for Relief, Petitioner asserts that his constitutional rights were violated by the State's peremptory excuse of prospective juror Blackmon. (Petition, Doc. No. 9 at 18); (Traverse, Doc. No. 170, PageID 1987.)

As with Grounds One and Two, Respondent asserts this claim is not properly pled because Petitioner has only reiterated the claim as he made it before the Ohio Supreme Court. (Return of Writ, Doc. No. 167, PageID 1850.) The Magistrate Judge concludes the claim is adequately pled within Habeas Rule 2(c).

The Ohio Supreme Court rejected this claim on direct appeal, writing as follows:

> In his fourth proposition of law, appellant argues that prosecutors exercised a peremptory challenge in a racially discriminatory manner. *Batson v. Kentucky* (1986), 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69, held that the Equal Protection Clause precludes "purposeful discrimination by the state in the exercise of its peremptory challenges so as to exclude members of minority groups from service on petit juries." *State v. Hernandez* (1992), 63 Ohio St. 3d 577, 581, 589 N.E.2d 1310, 1313. In order to make a prima facie case of purposeful discrimination, an accused must demonstrate (a) that members of a cognizable racial group were peremptorily challenged, and (b) the "facts and any other relevant circumstances raise an inference that the prosecutor" used the peremptory challenges to exclude jurors "on account of their race." *Id*. at 582, 589 N.E.2d at 1313.

Prospective juror Sandra Blackmon, an African-American, disclosed during voir dire that her son was in prison for drug trafficking. The prosecutor explained his peremptory challenge by noting that when his office prosecuted Blackmon's son for selling drugs to an undercover informant, Blackmon expressed "an attitude * * * that her son could do no wrong and that everybody was lying about her son[.]" Since Coleman's case involved murder of a drug informant by a drug trafficker, and Blackmon's son was then in prison for drug trafficking, the prosecutor could reasonably decide not to have her on the jury.

The trial court did not abuse its discretion in accepting the prosecutor's explanation, which was race-neutral on its face. Courts have accepted prior involvement with drugs by family members of prospective jurors as a race-neutral explanation after a Batson challenge. See, e.g., *United States v. Fisher* (C.A.5, 1994), 22 F.3d 574, 577; *United States v. Hughes* (C.A. 7, 1992), 970 F.2d 227, 230. Nothing in the record suggests a racial motivation, and "'unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.'" *Purkett v. Elem* (1995), 514 U.S. 765, 768, 115 S. Ct. 1769, 1771, 131 L. Ed. 2d 834, 839. Finally, a trial court's finding of no discriminatory intent will not be reversed "absent a determination that it was clearly erroneous." *State v. Hernandez*, 63 Ohio St. 3d at 583, 589 N.E.2d at 1314. The prosecutor's race-neutral explanation was credible and supported by the record; hence, it was not "clearly erroneous." Thus, we reject appellant's fourth proposition of law.

*State v. Coleman*, 85 Ohio St. 3d 129, 142-143 (1999).

It is clearly established United States Supreme Court law that the State may not exercise its [peremptory] challenges in a criminal case in violation of the Equal Protection Clause. It is impermissible to use the challenges to exclude from the jury minorities "for reasons wholly unrelated to the outcome of the particular case on trial" or to deny "the same right and opportunity to participate in the administration of justice enjoyed by the white population." *Batson v. Kentucky*, 476 U.S. 79, 91 (1986), *quoting Swain v. Alabama*, 380 U.S. 202, 224 (1965). As with any equal protection claim, the defendant who alleges the discrimination has the

burden of establishing "the existence of purposeful discrimination." *Id*.;*Whitus v. Georgia*, 385 U.S. 545, 550 (1967), *citing Tarrance v. Florida*, 188 U.S. 519 (1903). A state criminal defendant can establish a *prima facie* case of purposeful racial discrimination in the selection of jurors solely by proof of peremptory challenges to exclude members of the defendant's race. *Batson v. Kentucky*, 476 U.S. 79 (1986). A trial court must use a three-step process to evaluate a *Batson* claim. First, the opponent must make a *prima facie* showing that the proponent of the strike has exercised a peremptory challenge on the basis of race. The burden then shifts to the proponent to articulate a race-neutral reason for the challenge. Finally, the trial court must determine if the opponent has carried his burden of proving purposeful discrimination. *Purkett v. Elem*, 514 U.S. 765, 768 (1995); *Hernandez v. New York*, 500 U.S. 352 (1991).

To make a *prima facie* showing, a defendant must show that he is a member of a cognizable racial group, that a challenge has been exercised to remove a venireperson of the same race,[6] and any additional facts and circumstances from which an inference could be drawn that the prosecutor had used the peremptory challenge in a race-based manner. *Batson*, 476 U.S. at 79. The defendant is entitled to rely on the fact that the peremptory challenge process is one in which those who are of a mind to discriminate on the basis of race are able to do so. *Id*. A trial judge's conclusion that the challenge was race-neutral must be upheld unless it is clearly erroneous. *Hernandez*; *supra*; *United States v. Tucker*, 90 F.3d 1135, 1142 (6th Cir. 1996); *United States v. Peete*, 919 F.2d 1168, 1179 (6th Cir. 1990).

---

[6] The Court later determined that a defendant need not be of the same race as the excluded prospective juror to raise a *Batson* claim. *Powers v. Ohio,* 499 U.S. 400 (1991).

Specifically, Coleman alleges that Ms. Blackmon, an African-American woman, was denied a position on the jury when the State exercised its second peremptory challenge. (Trial Tr. Vol. 4 at 593.)  During voir dire the following exchanges took place:

> Mr. Schumaker:        Okay.  Now- - and I'm sorry, I don't mean to pry; but have any of you as far as family members, close friends, do any of you have any very close associations with those who have experienced drug problems?
>
> Juror No. 8:              (Indicating.)
>
> Mr. Schumaker:        Mrs. Blackmon.
>
> Juror No. 8:              Uh-huh.
>
> Mr. Schumaker:        Once again, I don't mean to pry.  I know it can be a sensitive area, but can you tell us just a little bit about that?
>
> Juror No. 8:              Well, my son, he's in prison now for drugs.
>
> Mr. Schumaker:        Okay.  Now, the fact that - - that that has occurred and that we are going to be talking about a - -a killing that is alleged to have occurred around drug trafficking, do you believe that that would affect your- -your deliberations and - - and enter into this?
>
> Juror No. 8:              No.
>
> Mr. Schumaker:        Okay.  Thank you very much.   Anybody else?

(Trial Tr. Vol. 4 at 542-543.)

> Mr. Schumaker:        Okay. Mrs. Blackmon, I'm sorry to have to inquire about this, but you indicated your son - -was this that a drug trafficking charge?
>
> Juror No. 8:              Yes.
>
> Mr. Schumaker:        Okay.  Did - - an individual buy drugs from your son?  Do you know?

> Juror No. 8:        I don't know.
>
> Mr. Schumaker:     Okay.  And I'll rely on your judgment. Given that experience and given the issues that I've just discussed with this jury, do you believe that - - that you can still be fair and impartial and give the defendant and the people of the State of Ohio a fair shake here?
>
> Juror No. 8:        Yeah, I think so.
>
> Mr. Schumaker:     Okay.  Would you harbor any ill will toward Miss Stevens as a result of what's occurred with your son?
>
> Juror No. 8:        Oh, no, no.

(Trial Tr. Vol. 4 at 547-548.)

> Mr. James Doughty:  Now, Mrs. Blackmon, I've heard about your unfortunate problem in your family; but could that in any way, any way at all, even microscopic way, could that interfere with your fair - -and deliberations in this case?
>
> Juror No. 8:    I don't think so.
>
> Mr. James Doughty:  No. It would not, would it?
>
> Juror No. 8:    Hu-huh

(Trial Tr. Vol. 4 at 570.)

After the State exercised its peremptory objection on Ms. Blackmon, defense counsel immediately objected based on *Batson v. Kentucky*. *Id*.  The judge then held a sidebar with counsel for both parties where they were permitted to both argue the objection and justify this peremptory challenge. *Id*.

> Mr. Jon Doughty:     Yeah. I think Steve needs to put something on record as to why he's excusing this black.
>
> Mr. Schumaker:     Yes, Your Honor.  In the course of the voir dire, Mrs. Blackmon indicated that her son was in prison on a trafficking case.

We - - I was able to locate that case at the break.  It's my understanding it's a case that my office prosecuted that originated in the Juvenile Court or that my office had also had contact.  If that wasn't the particular case, we had contact with her son in Juvenile Court, and we prosecuted that case.

It's my understanding from conferring with personnel that Mrs. Blackmon had expressed an attitude basically at that point that her son could do no wrong and that everybody was lying about her son in those cases in Juvenile Court and that given the fact that she had indicated that in the case where her son is in the penitentiary that there was an individual that brought - - bought drugs from her son and that we're dealing with Melinda Stevens' death who was doing that exact same thing for the Springfield Police Department, we felt that despite her best efforts, she simply couldn't put those experiences behind her.

Mr. Jon Doughty:      Well, Your Honor, I think the record should reflect that Mrs. Blackmon is a black lady and that she indicated in direct questioning that none of that incident would affect her performance as a Juror in this case.

We believe the reason the prosecutor is - -is exercising the preempt on Mrs. Blackmon is quite simply because she's a black woman.

The Court:            Well, there's an independent reason stated by the prosecutor and stated and articulated to the Court.  The Court indicates is not based on race.  It's based on the drug experience with her son and the prosecution by his office of her son.

And, therefore, it's not related to race; and with that independent and valid reason, the peremptory challenge is going to be allowed.

Mr. James Doughty:  Your Honor, I would like to interject too that what he's saying is her questions that were directed sitting in that chair there were that there was nothing about that case that would bother her.

Now, he's coming in here with a bunch of hearsay stuff about she's supposedly said certain things to the contrary to her answers here.

Now, if he can document that, then maybe we got a real question for the Court; but simply on what she's supposed to have said to

somebody does certainly not arise to that point where you can discharge this woman as a Juror. Her answers are contrary to anything - -

Mr. Schumaker:        I would simply indicate it's not due to race. It's due to the reasons that we indicated.

The Court:            Well, the State's articulated an independent reason why peremptory challenge should be exercised not related to race, and the Court will allow the independent peremptory challenge.

(Trial Tr. Vol. 4 at 594-596.)

The Court:     One other thing - -and the Jurors are still in the jury room. There was a peremptory challenge by the State as to the Juror, Mrs. Blackmon; and I think there are some other statements that counsel wants to put on record in regard to this peremptory challenge,

Prosecutor Schumaker:        Yes. Mr. Bachman will speak to that, Your Honor.

Mr. Bachman: Your Honor, I believe that the  - - the panel as it is presently constituted does have one member of African American heritage, and I would note that this morning there were three black individuals who had a possibility of being on the jury.

One was excused by the State on a peremptory challenge not based on race whatsoever, but based upon her statements made about her son being in prison and so forth; and I believe the State put that into the record already. And the other individual who did not make it on the panel indicated to the Court that she knew too much about the case and knew the victim and so forth, and she didn't feel that she could fairly sit here and judge this particular case.

And at her request and without objection from either side, she was excused for cause. That was Miss Trollinger.

So I would point out to the Court for the record that there is one black member on the panel at this point.

The Court:     Thank you. The - -in regard to that peremptory challenge, Miss Trollinger was excused. She was a black lady, but that was for a reason she indicated having some knowledge - -

outside knowledge of the case under consideration before the Court, and that that would influence her.

There was also Mr. Wilkerson, of course, who is a black man and a member of this jury panel acceptable to both parties.

The Court did not find a racial motivation in excusing Juror Sandra Blackmon. She indicated that her son had been prosecuted for a drug offense, and the prosecutor raised that question in peremptory challenge.

So the reason for exercising this peremptory challenge was not based on race but on the fact that her son had been prosecuted by his office, and there was some bitterness according to the statements that Mr. Schumaker did make on the record.

Further, that was put on the record that there are other members of the jury panel of African descent, referring to Jesse Wilkerson, and also that the victim in this case is a black woman, Melinda Stevens, a black woman, and that the case is not a racial case. It's a - - it doesn't involve a - -a race question in regard to the issues being presented here at all.

I think there was a valid reason for a peremptory challenge and not related to race; and independent of that issue whatsoever, the State did have a legitimate reason for using a peremptory challenge so I'll find that it was not racially motivated.

(Trial Tr. Vol. 4 at 645-647.)

Petitioner has not established a *Batson* violation. Based on the similar circumstances between Mrs. Blackmon's son and the defendant concerning drug trafficking, it seems appropriate counsel would have challenged this juror. (Trial Tr. Vol. 4 at 543, 547-548.) While her answers indicated that she thought she could be fair and impartial, she did also indicate that she had a son in prison for drug trafficking. *Id.* This is the same offense for which Petitioner was to be tried when Melinda Stevens was murdered in an effort to prevent her testimony. Additionally, Ms. Blackmon's son was convicted through the efforts of the same prosecutor's office which was trying this case. The State's neutral explanation for the excusal "need not rise

to the level justifying exercise of a challenge for cause." *Batson*, 476 U.S. at 97.  The State offered evidence sufficient to show that the challenge was not based on race and Judge Lorig concluded twice that the challenge was race neutral. (Trial Tr. Vol. 4 at 594-596.) The race neutral explanation is both credible and supported by the record.  Petitioner has failed to show facts to the contrary that give rise to the inference that the Prosecutor's use of this peremptory challenge was racially based.  To the contrary, there were very valid reasons for excusing Ms. Blackmon. The decision of the state court that Judge Lorig's determination was not clearly erroneous is neither contrary to nor an unreasonable application of clearly established United States Supreme Court law. The Fifth Ground for Relief should be dismissed with prejudice. Because reasonable jurists would not disagree with this conclusion, the Court should not grant a certificate of appealability on it.

### Ground Six:  Admission of Inaudible Tape Recordings

Judge Sargus has already ruled that this Ground for Relief was procedurally defaulted. Final judgment dismissing it with prejudice should be entered and no certificate of appealability should be issued because reasonable jurists would not disagree with his conclusion.

### Ground Seven:  Introducing Evidence from the Drug Case

In his Seventh Ground for Relief, Coleman argues the State deprived him of due process in the Murder Case by introducing evidence from the Drug case which was neither material nor relevant to the elements of aggravated murder.  (Petition, Doc. No. 9, PageID 33); (Traverse,

Doc. No. 170, PageID 1999.)  His position is that, to prove the capital specification, all the State needed to do was introduce a certified copy of the Indictment in the Drug Case and brief testimony establishing that the victim, Melinda Stevens, would have been a witness in that trial; everything else was cumulative and prejudicial (Petition, Doc. No. 9, PageID 33-34).

On direct appeal, the Ohio Supreme Court decided this claim as follows:

> Appellant argues in his third proposition of law that he was prejudiced by the state's introduction of irrelevant and cumulative testimony and other physical exhibits from his prior conviction for aggravated drug trafficking.  The state introduced evidence of Coleman's three drug sales to Stevens from July to August 1995.  Witnesses testified to the details of these sales, and the state admitted several exhibits including crack cocaine.  Appellant argues that to prove the R.C. 2929.04 (A)(8) death specification, the state should have been limited to introducing two pieces of evidence: a copy of the indictment charging Coleman with an offense and brief testimony by the state that Stevens would have testified against Coleman at trial.
>
> However, we believe that the trial court properly admitted evidence of Coleman's drug sales to Stevens.  The admission of the underlying facts regarding the three separate drug sales tended to prove motive, and evidence was introduced to demonstrate that Stevens was the key witness against appellant and that her murder would hinder the state's case against him by preventing her testimony, which explained appellant's motive and deep obsession with killing Stevens.  Thus, the drug sales are not considered "other acts" evidence limited by Evid. R. 404(B); rather, they were introduced to prove the R.C. 2929.04 (A)(8) death-penalty specification.  In *State v. Frazier* (1995), 73 Ohio St. 3d 323, 338-339, 652 N.E. 2d 1000, 1013-1014, we held that evidence that the accused previously raped the murder victim was "inextricably linked" to the murder when the victim was killed to silence her as a rape witness. Accord, *State v. Keene* (1998), 81 Ohio St. 3d 646, 661, 693 N.E.2d 246, 260.
>
> As in *Frazier*, the state has proven in this case that Coleman purposefully killed his victim with prior calculation and design, that he did so because she was a witness to a crime, and that she was killed to prevent her testimony.  As appellant himself stated to Gaskins, "if they don't have a witness, they don't have a case." These were not "wholly independent" crimes; hence, the state

> could reasonably prove not only that Stevens was a witness, but
> also precisely what crimes she witnessed and that she was a key
> witness. *Frazier*, 73 Ohio St. 3d at 339, 652 N.E.2d at 1014.  Nor
> do we find that the evidence was cumulative, as each police
> witness explained only those events which that witness directly
> observed.  Thus, we find that appellant's third proposition of law
> lacks merit.

*State v. Coleman*, 85 Ohio St. 3d 129, 140-141 (1999).

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62 (1991).  "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Id.* at 67-68.  "[E]rrors in application of state law, especially with regard to the admissibility of evidence, are usually not cognizable in federal habeas corpus." *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983); *see Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001).

Respondent directs the Court's attention to *Bey v. Bagley*, 500 F.3d 514, 520 (6th Cir. 2007). (Return of Writ, Doc. No. 167, PageID 1862.)  In that case the petitioner challenged the admission of certain evidence on direct appeal as both a state-law evidentiary error and a violation of due process.  In determining the standard of review, the Sixth Circuit held:

> In *Maldonado [v. Wilson*, 416 F.3d 470, 474 (6th Cir. 2005)], the
> petitioner had challenged the admission of certain evidence on
> direct appeal, as both a state-law evidentiary error and a violation
> of due process. *Id.* at 475.  The state appellate court affirmed the
> admission "solely on the basis of state evidentiary laws," finding
> the evidence non-prejudicial. *Id.*  Maldonado sought habeas relief
> on the theory that admission of the evidence violated due process,
> i.e., his fundamental right to a fair trial. *Id.* at 474.  "We explained
> that, although the state had not addressed the due process claim
> expressly, "the [state] court's [state-law] prejudice inquiry bore
> some similarity to a determination, under the Due Process Clauses
> of the Fifth and Fourteenth Amendments, of whether the admission
> of the challenged evidence rendered the trial fundamentally

unfair." *Id*. at 476 (emphasis added). Therefore, we concluded that a "modified AEDPA deference is appropriate." The present case is virtually identical to *Maldonado*. The Ohio Supreme Court conducted a prejudice inquiry and, in ruling that the trial court complied with Ohio R. Evid. 404 (B), found that the Mihas evidence's probative value outweighed any unfair prejudicial impact that it might also have had. See *Bey*, 709 N.E. 2d at 491.

Because the Ohio Supreme Court's prejudice inquiry into Bey's state-law claim bears at least "some similarity" to a determination of his current due process claim, we review this claim under *Maldonado's* modified AEDPA standard, which "requires [us] to conduct a careful review of the record and applicable law, but nonetheless bars [us] from reversing unless the state court's decision is contrary to or an unreasonable application of federal law [i.e., Supreme Court precedent]." *Maldonado*, 416 F.3d at 476; see also *Filiaggi v. Bagley*, 445 F.3d 851, 854 (6th Cir. 2006). Furthermore, because the Ohio Supreme Court's prejudice inquiry relied entirely on Ohio law without any reference to federal law, see *Bey*, 709 N.E.2d at 491, we need not consider whether that decision resulted in an unreasonable application of federal law. We need only look to the question of whether the Ohio Supreme Court's decision is contrary to federal law.

Before delving further into Bey's argument, we should note that Bey has not presented, nor have we discovered, any Supreme Court precedent indicating that a state court violates a criminal defendant's due process rights when it properly admits evidence of the defendant's other bad acts. We recognized as much in *Bugh v. Mitchell*, where we held that the state court's admission of "other acts" evidence was not contrary to clearly established Supreme Court precedent, inasmuch as "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh*, 329 F.3d at 512 (emphasis added). Therefore, under this circuit's precedent, the Ohio Supreme Court's decision that admission of this evidence was proper - - combined with our ordinary inability to reconsider a state court's state-law-based decisions - - would appear to defeat Bey's claim.

Thus, Bey is left to argue that regardless of its compliance with state law, the state's action may nonetheless violate due process, and thus be contrary to Supreme Court precedent. This theory offers two possibilities: either the state law (rule) itself contradicts Supreme Court precedent, or the state's application of the law (rule) under the particular circumstances does.

112

*Bey v. Bagley*, 500 F.3d 514, 520-521 (6th Cir. 2007), *quoting Maldonado v. Wilson*, 416 F.3d 470, 474 (6th Cir. 2005).  This standard of deference is, if anything, strengthened by the later decision of the Supreme Court in *Harrington v. Richter*, 562 U.S. ___, ___, 131 S. Ct. 770, 792 (2011).

In Coleman's trial, the State presented multiple witnesses to testify to the use of Stevens as an confidential informant in Coleman's drug case, the various procedures used in controlled drug buys, and that Stevens did in fact make controlled purchases of crack cocaine from Coleman. (Traverse, Doc. No. 170, PageID 2001.)  In addition they offered physical evidence of crack cocaine from one of the sales. *Id.*  Under Ohio law, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person or to show that he acted in conformity with the prior conduct.  "It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid. R. 404(B).  The State explained to the trial court who they were presenting as witnesses and the reason behind the anticipated testimony:

> This is to establish a number of things; but primarily as to the drug officers, it's to establish that, in fact, that a criminal case was developed in which Miss Stevens was a witness and that, in fact, that is why - - it's to lay the foundation that that's why she was killed because the way that case proceeded is how Mr. Coleman figured out that she was going to be a witness and ultimately killed her.

(Trial Tr. Vol. 4 at 666.)  The Ohio Supreme Court agreed with the State, finding that the evidence went to establish motive; "[t]he admission of the underlying facts regarding the three separate drug sales tended to prove motive, and evidence was introduced to demonstrate that Stevens was the key witness against appellant and that her murder would hinder the state's case

113

against him by preventing her testimony, which explained appellant's motive and deep obsession with killing Stevens." *State v. Coleman*, 85 Ohio St. 3d 129, 141 (1999). Under Sixth Circuit precedent, combined with an inability to consider a state court's state-law-based decisions, Coleman cannot show that the Ohio courts admission of this evidence was improper. *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003); *Bey v. Bagley*, 500 F.3d 514, 520-521 (6th Cir. 2007); *Maldonado v. Wilson*, 416 F.3d 470, 474 (6th Cir. 2005).

Petitioner can argue, however, that Ohio Evid. R. 404(B) contradicts Supreme Court precedent and violates a fundamental right and that the evidence admitted in this case was so unfairly prejudicial that "it offends [a] principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental . . ." for example, the right to a fair trial. (Petition, Doc. No. 9, PageID 33-36.)  In addition, Petitioner argues that the "carry over" effect of the improperly admitted evidence violated the Eighth and Fourteenth Amendment guarantees that "any decision to impose the death penalty be, and appear to be based on reason rather than caprice or emotion." *Id.*, at 36, *quoting Gardner v. Florida*, 430 U.S. 349, 358 (1977).

The Supreme Court has "very narrowly" defined the category of infractions that violate fundamental fairness. *Dowling v. United States*, 493 U.S. 342, 352 (1990).

> Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation.  We, therefore, have defined the category of infractions that violate 'fundamental fairness' very narrowly.  As we observed in [*United States v.*] *Lovasco*, [431 U.S. 783, 97 S. Ct. 2044, 52 L. Ed. 2d 752 (1977)]: Judges are not free, in defining 'due process,' to impose on law enforcement officials their personal and private notions of fairness and to disregard the limits that bind judges in their judicial function.  They are to determine only the limits that bind judges in their judicial function.  They are to determine only whether the action complained of violates those fundamental conceptions of justice which lie at the base of our civil and political institutions, and which define the community's sense of fair play and decency.

*Id*. at 352-53.

The trial court overruled objections to the testimony.  As explained by the State and accepted by the state courts, the admitted evidence went to establishing motive. (Trial Tr. Vol. 4 at 666); *State v. Coleman*, 85 Ohio St. 3d 129, 140-141 (1999).  The testimony established that the victim was a confidential informant for the police, that she had made several controlled buys of crack cocaine from Coleman, and that she was going to testify to this involvement during his trial for drug trafficking.  This is further corroborated by additional witnesses that testified during the murder trial that Coleman himself had told them he was going to get rid of the Stevens because if there was not a witness, then they did not have a case against him.  This all speaks to motive.  Trial counsel had the opportunity to prepare for, to challenge this evidence, to cross-examine the witnesses, and to present rebuttal evidence.  Petitioner has not made a showing that he was unfairly prejudiced nor has he demonstrated that his circumstances come under the narrow category of infractions as discussed in *Dowling*, *supra*.  A defendant is not entitled to limit the State's case to the bare minimum of evidence which would show the elements of a crime or specification.  The evidence complained of was relevant to proving that Stevens was a key witness and thus that Coleman would have had a motive to kill her even stronger than the usual motive of a defendant to eliminate any witness against him or her. The Ohio Supreme Court decision on this claim was neither contrary to nor an unreasonable application of clearly established federal law.  Therefore the Seventh Ground for Relief should be dismissed with prejudice.  Because reasonable jurists would not disagree with this conclusion, the Court should therefore not grant a certificate of appealability on it.

**Ground Eight:  Insufficient Evidence of Prior Calculation and Design**


Petitioner has withdrawn this Ground for Relief (Traverse, Doc. No. 170, PageID 2006).


**Conclusion**


In accordance with the foregoing analysis, it is respectfully recommended that the Petition be dismissed with prejudice.  The Court should grant a certificate of appealability on Grounds Two and  Five, but otherwise deny a certificate.


November 28, 2012.

s/ *Michael R. Merz*
United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**


Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).